BIG FARMER, INC., Plaintiff-Appellant, v. AGRIDATA RESOURCES, INC., *et al.*, Defendants-Appellees.

Third District   No. 3—91—0125

Opinion filed October 25, 1991.

Timothy J. Rathbun, of McKeown Law Office, of Joliet (Scott M. Belt, of counsel), for appellant.

. Herschbach, Tracy, Johnson, Bertani & Wilson, of Joliet, (George F. Mahoney III, of counsel), for appellee.

JUSTICE HAASE delivered the opinion of the court:

The plaintiff, Big Farmer, brought suit against the defendant, Agridata Resources, for breach of contract. Big Farmer is in the business of providing demographic information and mailing lists to various farming-related industries. Agridata is the publisher of a farming magazine, Farm Futures. Big Farmer provided 61,807 names and addresses to Agridata of farmers in a certain income group. Agridata used the information to solicit potential subscribers. Of the 61,807 solicitations, 7,179 persons responded. Big Farmer claims Agridata agreed to pay 50 cents for *each name* provided. Agridata claims it agreed to pay 50 cents for *each response* it received from the mailing. Agridata tendered a check to Big Farmer for $3,589.50 which Big Farmer rejected. After a bench trial, the trial court ruled that there was no meeting of the minds between the parties as to price and, therefore, no contract. The court refused to allow the plaintiff to amend its complaint to include a *quantum meruit* claim. The court ruled that the plaintiff had presented no evidence upon which a *quantum meruit* claim could be granted. The court entered judgment in favor of the defendant. The plaintiff appeals. We affirm.

Ralph Dralle, president of Big Farmer, and Richard Olmstead, the advertising director for Agridata, first met in 1983. At that time the two men discussed the possible sale of names and demographic information to Agridata. Agridata wished to increase the circulation of its farm publication and wished to target farmers with gross sales over $100,000. At this time the talks were preliminary, and the two men reached no agreement. In 1985 they met again and arranged the sale of 750 names to Agridata at $1 per name. The purpose of this sale was to test the reliability of the names provided by Big Farmer.

In April of 1986 the two men met at an advertising seminar and discussed the quality of the prior 750 names provided by Big Farmer and the possibility of future sales. Olmstead advised Dralle that Agridata wished to increase the circulation of its magazine by 20,000 names. According to Dralle, he gave Olmstead a rate card at this time. Olmstead indicated that his company might be interested in making a deal with Big Farmer and advised Dralle to contact Chris Krajcir, a circulation manager for Agridata.

Dralle then sent Krajcir a letter outlining his discussion with Olmstead. According to the letter, Dralle reflected the price would be "$.50 per name added," and he enclosed an additional copy of the same rate card he had previously given Olmstead. The rate card reflected the price would be "$.50 per net name added." The difference between the terms "per name added" and "per net name" is impor-

tant. The parties agree, "per net name added" is a term of art which means the total number of names provided to a publication. "Per name added" means the number of names added to the magazine's circulation list. Krajcir testified she discussed the term "per name added" when talking with Dralle by phone in April of 1987. Dralle asserts the agreement between the parties contemplated the payment of $.50 "per net name."

In July of 1987, Dralle forwarded 61,807 names to the attention of Krajcir at Agridata along with an invoice showing a balance due of $30,916. The invoice calculated the amount due based upon a "per net name" basis. Krajcir testified that the day after she received the invoice she called Dralle and said "Ralph, I just got an invoice for $30,000 dollars, what the heck is this for." According to Krajcir, Dralle responded "Don't worry, they have probably billed you for the whole amount." Krajcir never sent Big Farmer a written protest in response to the invoice. Agridata used the 61,807 names and sent Big Farmer a check for $3,589.50. Big Farmer returned the check to Agridata.

At trial, the defendant offered the testimony of Francis King, president and owner of Market I.D., an agricultural marketing company. King testified that he is a competitor of Big Farmer and has supplied names to Agridata in the past. The main point of King's testimony was to establish the meaning of certain terms in the mail-solicitation industry. King also testified that if he would have supplied the names to Agridata, the contract price would have been $17,320. King did not testify as to the reasonable value of the services rendered by Big Farmer to Agridata. The plaintiff offered no testimony as to the reasonable value of the services provided.

■ Since both parties deal in the purchase and sale of mailing lists and demographic information, both parties are merchants as that term is defined in the Uniform Commercial Code. (Ill. Rev. Stat. 1989, ch. 26, par. 2–104.) In addition, since the information at issue is moveable and not otherwise precluded from the purview of the Uniform Commercial Code, the information may be considered goods as defined by statute. (Ill. Rev. Stat. 1989, ch. 26, par. 2–105.) Having determined that the Uniform Commercial Code is applicable, the issue of the "meeting of the minds" comes into focus.

■ Section 2–207 of the Uniform Commercial Code (UCC) was designed to alleviate the "battle of the forms" situation commonly occurring in business transactions. (*Tecumseh International Corp. v. City of Springfield* (1979), 70 Ill. App. 3d 101, 104, 388 N.E.2d 460.) This section specifically rejects the common law mirror image rule of

offer and acceptance. (See J. White & R. Summers, Uniform Commercial Code §1—2, at 23-24 (1972).) Under that section, if conduct of the parties recognizes the existence of contract, then a contract for sale is formed even though the writings of the parties do not establish a contract. (*Album Graphics, Inc. v. Beatrice Foods Co.* (1980), 87 Ill. App. 3d 338, 347.) The contract is then considered to consist of all the terms on which the writings of the parties agree. All other terms are supplied by the provisions of the UCC:

> "Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case[s] the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provision of this Act." Ill. Rev. Stat. 1989, ch. 26, par. 2—207(3).

■ In the case at bar, the only point at issue is the manner in which amount due on the contract is to be calculated. The invoice and rate card sent by Dralle to Agridata indicate that the amount due is to be calculated on a "per net name" basis. Dralle's letter to Krajcir in April of 1987, however, recited that a "per name" basis was applicable. Since these terms are in conflict, they "knock-out" each other and are treated as if the parties said nothing as to price. In such a case, UCC section 2—305 sets "a reasonable price at the time [of] delivery" as the amount to be paid. (Ill. Rev. Stat. 1989, ch. 26, par. 2—305.) The difficulty with the case at bar is that the plaintiff offered no testimony as to the reasonable value of the services rendered.

> "THE COURT: Let me ask you this question Mr. Rathbun. Assuming the Court denies the Motion to amend the pleadings to conform to the proofs, on the basis that there is no evidence in this record to establish what the fair and reasonable value of the services rendered by the Plaintiff to the Defendant in this case were, are you prepared to offer any other or additional evidence in support of your motion?
>
> MR. RATHBUN [Plaintiff's Attorney]: No ***."

Plaintiff's counsel went on to explain that he did not intend to impeach his client's testimony by presenting evidence that the value of the services rendered was less than the requested amount. Counsel argued that the rate card Dralle gave Olmstead formed the basis of the parties' agreement and that the plaintiff was entitled to a judgment for the full amount sought. This was obviously a strategic deci-

sion on the plaintiff's part. Unfortunately, it left the trial court without proof of the reasonable value of the services provided.

In the alternative, the plaintiff argues that his own testimony and that of Francis King, the defendant's expert, should form the basis of a *quantum meruit* claim. An examination of their testimony, however, reveals that both men testified how *they* normally charged customers. Neither testified as to industry-wide standards or formulated an opinion as to the reasonable value of the services Big Farmer provided Agridata.

A review of the record shows that the court afforded the plaintiff every opportunity to present evidence as to the reasonable value of the services Big Farmer provided Agridata. For strategic reasons, the plaintiff declined to present such evidence. Lacking proof upon which a *quantum meruit* claim could be granted, the trial court correctly refused to allow the plaintiff to amend his complaint. Nor did the court choose to speculate as to what the reasonable value of the plaintiff's services might be. In our estimation, the trial court's actions were entirely proper.

For the aforesaid reasons, the judgment of the Circuit Court of Will County is affirmed.

Affirmed.

GORMAN and McCUSKEY, JJ., concur.