[No. B193251. Second Dist., Div. Four. June 20, 2008.]

WALL STREET NETWORK, LTD., Plaintiff and Appellant, v.
NEW YORK TIMES COMPANY et al., Defendants and Respondents.

## COUNSEL

Arnold G. Regardie for Plaintiff and Appellant.

Dykema Gosset, Allan Gabriel and Brian C. Oh for Defendants and Respondents.

OPINION

**MANELLA, J.**—In the underlying action for breach of contract and misrepresentation by appellant Wall Street Network Ltd. (WSN), the trial court granted summary judgment in favor of respondents New York Times Company (NYT), NETexponent, Chris Kramer, Jason Lerman, and Michael Keenan, and issued an award of attorney fees to respondents. We affirm.

## FACTUAL AND PROCEDURAL HISTORY

There are no material disputes about the following facts: WSN is the assignee of Click2Boost, Inc. (C2B), which entered into an Internet marketing agreement with NYT dated May 10, 2002. Respondent Michael Keenan, who is NYT's Web product manager, executed the agreement on behalf of NYT. Respondents Chris Kramer and Jason Lerman are employees of respondent NETexponent, which acted as NYT's agent regarding the agreement. The agreement contained a provision entitling the prevailing party in litigation arising out of the agreement to an award of attorney fees and costs.

Under the agreement, C2B was to solicit subscribers for home delivery of The New York Times newspaper by means of "pop up ads" at Internet Web sites with which C2B maintained "[m]arketing [a]lliances." According to C2B's description of the Internet marketing system it used in connection with the agreement, a person who clicked on the pop up ad was invited to submit his or her ZIP code; if the ZIP code was suitable for home delivery of the New York Times, the person was prompted to provide additional information needed for a subscription; upon submission of this information, the C2B system displayed a confirmation of the subscription. The agreement required NYT to pay C2B a fee or commission for each home delivery subscription C2B submitted to NYT. NYT paid C2B more than $1.5 million in subscription submission fees from May 2002 to September 2003, and terminated the agreement on September 16, 2003.

In October 2003, WSN, proceeding as C2B's assignee with respect to its rights under the agreement, initiated the underlying action. On November 7, 2003, WSN filed its first amended complaint (FAC), which asserts a claim for breach of contract against NYT, claims for inducing breach of contract, aiding and abetting breach of contract, and conspiracy to induce breach of contract against Kramer, Lerman, and Keenan, and claims for misrepresentation against all the respondents.[1] The FAC alleges that NYT breached the

---

[1] The FAC alleges that NYT is the parent company of the New York Times which it names as an additional defendant with respect to the claim for breach of contract. On appeal, neither WSN nor respondents identify the New York Times as a separate party to this action.

agreement by terminating it before September 30, 2003, and that this breach was due to improper conduct by Kramer, Lerman, and Keenan. On March 16, 2004, NYT filed a cross-complaint for breach of contract against C2B, alleging that at least 90 percent of C2B's subscription submissions "were in fact names and addresses of individuals who did not subscribe to The New York Times newspaper for home delivery and/or whose addresses proved to be addresses to which the newspaper could not be delivered." The cross-complaint requested restitution of the approximately $1.5 million in fees NYT had paid C2B.

C2B sought summary judgment on NYT's cross-complaint, and respondents filed a motion for summary judgment or adjudication on the FAC. Respondents contended, inter alia, that summary judgment was proper because WSN could not establish that C2B had performed under the agreement. Following a hearing on April 5, 2005, the trial court denied C2B's motion and granted respondents' motion.

On April 14, 2005, WSN filed a motion for reconsideration of the ruling on respondents' motion, contending that the depositions of representatives of two of C2B's marketing alliance partners—Donald L. Cerullo, Jr., of LSF Network, Inc., and Brian Nelson of Trancos, Incorporated—raised triable issues of fact regarding C2B's performance under the agreement. The trial court granted the motion for reconsideration in part, denying respondents' motion for summary judgment, but granting summary adjudication on each claim in the FAC except the breach of contract claim.

NYT sought relief from this ruling by petition for writ of mandate. In a published opinion, this court concluded that reconsideration was improper because the deposition testimony was available to WSN prior to the ruling on NYT's motion for summary judgment. (*New York Times Co. v. Superior Court* (2005) 135 Cal.App.4th 206, 212–215 [37 Cal.Rptr.3d 338].) We directed the trial court to vacate its order granting reconsideration and reinstate its order granting respondents' motion for summary judgment. (*Id.* at p. 216.)

On May 23, 2006, the trial court filed an order granting respondents' motion for summary judgment and entered judgment in respondents' favor on the FAC. WSN filed a motion for a new trial, which the trial court denied. On October 4, 2006, the trial court issued respondents an award of $1,430,754.50 in attorney fees against WSN and C2B.

## DISCUSSION

WSN contends the trial court erred in granting summary judgment, denying WSN's motion for a new trial, and issuing a fee award against it. We disagree.

### A. New Trial Motion Following Summary Judgment

Generally, "[a] defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail. [Citation.]" (*Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].) The defendant may carry this burden by showing "that the plaintiff cannot establish at least one element of the cause of action—for example, that the plaintiff cannot prove element *X*." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).) The defendant need not "conclusively negate" the element; all that is required is a showing "that the plaintiff does not possess, and cannot reasonably obtain, needed evidence." (*Id.* at pp. 853–854.) Following a grant of summary judgment, we review the record de novo for the existence of triable issues, and consider the evidence submitted in connection with the motion, with the exception of evidence to which objections were made and sustained. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 [100 Cal.Rptr.2d 352, 8 P.3d 1089].)[2]

An order granting summary judgment is properly challenged by a motion for a new trial. (*Aguilar, supra,* 25 Cal.4th at p. 858.) "This is so, even though, strictly speaking, 'summary judgment . . . is a determination that there shall be no trial at all.' " (*Ibid.,* quoting *Green v. Del-Camp Investments, Inc.* (1961) 193 Cal.App.2d 479, 481 [14 Cal.Rptr. 420].) The new trial motion may seek reversal of the summary judgment on "any available statutory ground for a new trial" (6 Witkin, Cal. Procedure (4th ed. 1997) Proceedings Without Trial, § 232, p. 642), which encompasses contentions that there are triable issues of fact (see *Green v. Del-Camp Investments, Inc., supra,* 193 Cal.App.2d at pp. 482–483).

Generally, rulings on new trial motions are reviewed for an abuse of discretion. (*Aguilar, supra,* 25 Cal.4th at p. 859.) Nonetheless, in the case of an order denying a new trial following summary judgment, the determinations underlying the denial dictate our standard of review. (See *id.* at pp. 859–860.) To the extent the denial relies on the resolution of a question of law, including the nonexistence of triable issues of fact, we examine the matter de novo. (*Aguilar, supra,* 25 Cal.4th at p. 860; see *Green v. Del-Camp Investments, Inc., supra,* 193 Cal.App.2d at pp. 482–483.) We therefore review WSN's challenge to the denial as we would examine a direct attack on

---

[2] Motions for summary adjudication are subject to the same rules and procedures as motions for summary judgment. (*Lunardi v. Great-West Life Assurance Co.* (1995) 37 Cal.App.4th 807, 819 [44 Cal.Rptr.2d 56].) Generally, "the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar, supra,* 25 Cal.4th at p. 850.)

the order granting summary judgment, insofar as WSN asserts that the evidence considered by the trial court when it granted summary judgment raised triable issues of fact. We examine other determinations underlying the denial "under the test appropriate to such determination." (*Aguilar, supra,* 25 Cal.4th at p. 859.)

## B. *Forfeiture*

■ We begin by assessing the extent to which WSN has forfeited its contentions of error regarding the grant of summary judgment. Generally, appellants forfeit or abandon contentions of error regarding the dismissal of a cause of action by failing to raise or address the contentions in their briefs on appeal. (*Martinez v. County of Los Angeles* (1986) 186 Cal.App.3d 884, 887, fn. 2 [231 Cal.Rptr. 96]; see *Johnson v. United Services Automobile Assn.* (1998) 67 Cal.App.4th 626, 632, fn. 2 [79 Cal.Rptr.2d 234]; *Tan v. California Fed. Sav. & Loan Assn.* (1983) 140 Cal.App.3d 800, 811 [189 Cal.Rptr. 775].) Thus, failure to address summary adjudication of a claim on appeal constitutes abandonment of that claim. (*PMC, Inc. v. Saban Entertainment, Inc.* (1996) 45 Cal.App.4th 579, 590, fn. 5 [52 Cal.Rptr.2d 877], disapproved on another ground in *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1159, fn. 11 [131 Cal.Rptr.2d 29, 63 P.3d 937]; *Biljac Associates v. First Interstate Bank* (1990) 218 Cal.App.3d 1410, 1420 [267 Cal.Rptr. 819].)

Respondents' motion sought summary judgment, or alternatively, summary adjudication on each of WSN's causes of action in the FAC. The motion attacked the claims on the ground that WSN could not establish that it had performed under the agreement, and also asserted that each claim—with the exception of the claim for breach of contract—failed on additional grounds. In granting summary judgment, the trial court determined that summary adjudication was proper on each claim for the reasons that respondents had advanced.

WSN's briefs focus exclusively on C2B's performance under the agreement, and do not discuss the independent grounds for summary adjudication on the claims in the FAC other than the breach of contract claim. Because WSN has forfeited any contention of error regarding the independent grounds for summary adjudication on the remaining claims, we limit our inquiry to WSN's claim for breach of contract, and affirm the summary judgment with respect to the remaining claims. (*Yu v. Signet Bank/Virginia* (1999) 69

Cal.App.4th 1377, 1398 [82 Cal.Rptr.2d 304]; *Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6 [76 Cal.Rptr.2d 457].)[3]

## C. *Parties' Showings and Ruling*

The standard elements of a claim for breach of contract are "(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff therefrom. [Citation.]" (*Regan Roofing Co. v. Superior Court* (1994) 24 Cal.App.4th 425, 434–435 [29 Cal.Rptr.2d 413].) Here, respondents sought summary adjudication on the ground that WSN could not prove the second element, that is, either that C2B had performed under the contract, or that there was an adequate excuse for C2B's nonperformance.

Respondents submitted declarations and other evidence supporting the following version of the underlying events: NYT initially agreed to pay C2B $30 for each confirmed home delivery subscription. From May 2002 to May 2003, C2B generated between 100 and 400 subscription submissions per month. NYT subsequently agreed to pay C2B $50 for each subscription submission provided from June 12 to September 30, 2003. NYT received 8,306 submissions from C2B in July 2003, and 10,005 submissions in August 2003.

In August 2003, NYT learned that newspaper delivery could not be started for 12 percent of the submissions due to deficiencies in the address information. On September 8, 2003, representatives of NYT, C2B, and NETexponent met to establish measures to prevent the deficiencies in new submissions. In addition, NYT informed C2B at the meeting that its "target ceiling" for September 2003 was 12,000 submissions.

From September 1 to September 10, 2003, C2B provided 2,542 subscription submissions. On September 11, 2003, it forwarded another 2,522 submissions, and by September 16, 2003, its total number of submissions for September 2003 had exceeded NYT's target ceiling. NYT terminated the agreement on September 16, 2003.

---

[3] On a related matter, WSN argues that respondents have forfeited their opposition to numerous contentions raised in WSN's opening brief by failing to address these contentions in their brief on appeal. We reject any such application of the forfeiture rule. As our Supreme Court has explained: "Such a rule would require a [respondent] to respond to his opponent's every argument, subargument, and allegation, no matter how meritless or briefly made. A failure to respond to an opponent's argument may be unwise as a tactical matter, but such failure does not warrant the inflexible rule proposed by [the appellant]." (*People v. Hill* (1992) 3 Cal.4th 959, 995, fn. 3 [13 Cal.Rptr.2d 475, 839 P.2d 984], overruled on another point in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618].)

NYT paid C2B more than $1.5 million in subscription submission fees from May 2002 to September 2003. Almost all of the purported subscription submissions from C2B were cancelled or stopped because the subscriber failed to pay for the subscription. As of December 2, 2003, NYT determined that only 36,391 of the 45,311 purported subscription submissions from C2B could be processed. Of those, nearly 90 percent were stopped or cancelled. Over 13,400 processed subscriptions were discontinued because the purported subscribers contended they had never ordered The New York Times newspaper. Only 187 submissions from C2B had resulted in "any payment whatsoever" for home delivery of The New York Times newspaper. In contrast, over 70 percent of subscribers NYT obtained through other Internet-based campaigns had remained subscribers after 90 days.

Respondents' key contentions regarding WSN's lack of evidence to establish C2B's performance were set forth as facts Nos. 21 through 23 in their separate statement: "21. WSN has no information that it can use to demonstrate that C2B has performed the terms and conditions of its Agreement with NYT. WSN possesses no first-hand knowledge concerning the C2B computer system used by C2B in the performance of its Agreement with NYT. [¶] 22. WSN has no first-hand knowledge about C2B's claim against NYT, and no one at WSN will present evidence or testify in this matter or be able to testify in this matter. All testimony and/or information will be derived from C2B. [¶] 23. The only information WSN has concerning the names submitted by C2B to NYT came from Alon Nachom, founder of C2B. Alon Nachom told Abe Nachom [WSN's founder and Alon Nachom's brother] that the names submitted by C2B to NYT came from C2B 'Marketing Alliances' and/or from C2B's 'cross-marketing campaign.' "

To establish these and related contentions, NYT pointed to WSN's and C2B's discovery responses. In discovery, WSN had provided NYT with a lengthy list of names and Internet Protocol (IP) addresses (the list), unaccompanied by any explanation of its significance or the process by which it was created. The list began with the name, "jon doe," and ended with the name, "John Smith Jr." WSN founder Abe Nachom stated in his deposition that no one employed by WSN—including himself—had firsthand knowledge of C2B's claims or could testify about those claims. He further conceded that he knew little about C2B's computer system. According to Abe Nachom, the limited information he possessed about the subscription orders C2B had provided to NYT came from his brother, Alon Nachom.

In response to respondents' interrogatories, C2B stated that the sources—that is, the IP addresses—of the subscription orders from C2B's pop up ads had been captured in "order data files," but denied that the IP addresses were stored on any computers, servers, or backup tapes. C2B also refused to

designate any of its officers, employees, or agents as "most qualified" to testify regarding the IP address records. Alon Nachom declined in his deposition to identify any then current directors of C2B. Citing confidentiality agreements, he also declined to reveal the identity and number of the Web sites at which C2B had placed pop up ads soliciting subscriptions to The New York Times. He acknowledged that he was not a "technical person," and that he relied on others for information about C2B's records. He believed there were records reflecting the IP addresses of orders placed through the pop up ads, but did not know where the records were or how they might be compiled.

In an effort to raise triable issues, WSN submitted deposition testimony from Alon Nachom, who described features of the Internet marketing system C2B had used in connection with its agreement with NYT. According to Alon Nachom, C2B's computer servers were located in New Jersey and were handled by his brother, Kobi Nachom; customers seeking a New York Times subscription in response to the pop up ads entered their ZIP codes and other information, and then pressed a "submit" button; C2B's system in New Jersey checked submissions for missing or duplicative information; and then C2B transmitted the submissions to NETexponent.

In addition, WSN pointed to a declaration from Sidney S. Sohn, C2B's counsel, who stated that C2B had produced 4,192 pages of documents in response to NYT's discovery requests, including "a copy of 45,311 subscription admissions provided to NYT by C2B pursuant to the Agreement." Sohn's declaration incorporated by reference the first and last pages of the list WSN had provided to NYT in discovery. Regarding these pages, Sohn stated: "As indicated in the document, C2B performed all duties pursuant to the Agreement when it forwarded 45,311 subscription submissions completed by Internet users through . . . C2B's Internet marketing system . . . to NYT."

Respondents objected to Alon Nachom's testimony and Sohn's declaration on numerous grounds. In granting summary judgment, the trial court sustained these objections, reasoning that Alon Nachom's testimony lacked foundation and constituted inadmissible hearsay, and that Sohn's declaration provided no admissible foundation regarding the list. In view of these rulings, the trial court concluded that respondents had successfully shifted the burden to WSN to establish that it had evidence of C2B's performance under the agreement, and that WSN had failed to raise a triable issue on this matter.[4]

---

[4] In so ruling, the trial court noted that the FAC did not allege that C2B's nonperformance was excused.

### D. *Absence of Triable Issues*

In our view, the trial court did not err. Because WSN has not challenged the evidentiary rulings barring Alon Nachom's testimony and Sohn's declaration, we exclude this evidence from our review of the summary judgment motion. (*County of Alameda v. Superior Court* (2005) 133 Cal.App.4th 558, 564, fn. 3 [34 Cal.Rptr.3d 895].)

To identify the performance required of C2B, we examine its agreement with NYT. (See *Gaggero v. Yura* (2003) 108 Cal.App.4th 884, 890 [134 Cal.Rptr.2d 313].) In the agreement, C2B stated that it had created a "cross selling system"—called POPS—that permitted NYT to advertise its products and services through C2B's "[m]arketing [a]lliances," or "e-commerce partners," who "offer [C2B's] POPS[] to their customers," that is, "individual[s] who make[] an online purchase, or online download." The agreement further stated that NYT and C2B "intend[ed] to form a business relationship whereby [NYT] advertises and promotes its products and services on C2B's POPS[] cross selling system in return for a fee from [NYT] to C2B." C2B agreed to "post the customer information to [NYT] so [that NYT] shall be able to confirm and process the orders," and to make available to NYT "[o]n a monthly basis . . . a count of the number of customers who have agreed and confirmed to enroll in the [NYT's] services and/or to purchase products/service *via the POPS system.*" (Italics added.) Accordingly, the agreement, by its plain language, obliged C2B to derive subscription information through the POPS system from individuals who were customers of C2B's affiliated Internet marketing partners.

Respondents' showing established that WSN could obtain evidence regarding C2B's performance solely from C2B, which lacked records of the sources of the information it had sent to NYT, and refused to reveal the identities of its marketing alliance partners. In view of the trial court's evidentiary rulings, WSN offered (1) no admissible evidence that C2B had, in fact, obtained the information in accordance with the agreement, and (2) no explanation as to how WSN might obtain this evidence. Respondents thus established that WSN "[did] not possess, and [could not] reasonably obtain, needed evidence." (*Aguilar, supra,* 25 Cal.4th at p. 854.)

In an effort to raise triable issues of fact, WSN contends that the parties hold conflicting interpretations of WSN's obligations under the agreement. WSN argues that the agreement obliged it only to provide subscription submissions to NYT, where a subscription submission "is comprised of [a]

full name, mailing address, e[-]mail address, zip code, telephone number, and product name and price." WSN contends that, in contrast, NYT construes the agreement to require C2B to provide orders from individuals who actually intended to subscribe to The New York Times.

This purported dispute does not preclude summary judgment. As we have explained, the agreement obliged C2B—at a minimum—to obtain the information it sent to NYT through its POPS system, that is, from customers of C2B's marketing partners who responded to C2B's pop up ads. WSN's opposition to respondents' motion itself stated that "C2B's contracted for performance . . . was only to forward NYT home delivery order information, i.e., subscription submissions, completed by Internet users through . . . C2B's Internet marketing campaign created for NYT." In our view, respondents established that WSN could not show C2B had discharged this contractual obligation.

WSN contends that respondents failed to submit admissible evidence in support of their summary judgment motion. To provide a foundation for respondents' evidentiary showing, they submitted a declaration from Attorney Pamela Maher, who stated that she had personal knowledge of the litigation, and that the documents attached to her declaration—which included a copy of the list that WSN had provided to NYT—were true copies of materials obtained through discovery. WSN contends that Maher's declaration was incurably incompetent. In addition, WSN argues that Maher's declaration was inadequate to establish that the copy of the list was admissible because she had no personal knowledge of the list's creation.[5] As explained below, WSN is mistaken.

Under our summary judgment statute, declarations must "be made . . . on personal knowledge, . . . set forth admissible evidence, and . . . show affirmatively that the [declarant] is competent to testify to the matters stated in the affidavits or declarations." (Code Civ. Proc., § 437c, subd. (d).)[6] Maher's declaration stated that she had personal knowledge of the litigation and other facts set forth in the declaration, but omitted an express statement that she was competent to testify. After WSN's opposition objected that

---

[5] WSN also raised many other objections to respondents' showing, which the trial court overruled. With the exception of the objections discussed below, WSN does not challenge these rulings on appeal, and to that extent, has forfeited any contention of error regarding the rulings.

[6] All further statutory citations are to the Code of Civil Procedure, unless otherwise indicated.

Maher's declaration did not meet the statutory requirements, respondents submitted with their reply an amended declaration from Maher, which asserted her competence to testify. The trial court overruled WSN's objection to Maher's original declaration, and admitted her amended declaration, reasoning that "WSN was in no way prejudiced by the filing of the amended declaration."

In so ruling, the trial court also rejected WSN's objection to the admissibility of the list. It stated: "WSN objects to the admission of a raw batch file . . . , arguing that the file is not authenticated and lacks [a] foundation. . . . That is precisely [respondents'] point. The file, which allegedly evidences WSN's performance, lacks any foundation. No evidence in the record explains what it is or from where it was obtained."

We see no error in these rulings. The omission of an express statement concerning Maher's testimonial competence did not render her original declaration defective, as the declaration establishes that her personal knowledge of the litigation rendered her competent to testify that respondents had obtained the materials—*including* the list—through discovery. (*Roy Brothers Drilling Co. v. Jones* (1981) 123 Cal.App.3d 175, 182 [176 Cal.Rptr. 449].) Moreover, a trial court may properly consider new evidence submitted with a reply brief "so long as the party opposing the motion for summary judgment has notice and an opportunity to respond to the new material." (*Plenger v. Alza Corp.* (1992) 11 Cal.App.4th 349, 362, fn. 8 [13 Cal.Rptr.2d 811].) Here, Maher's original declaration identified the substantive evidence upon which respondents sought summary judgment. WSN objected to Maher's amended declaration at the hearing on summary judgment motion, but never identified any prejudice from its admission. Accordingly, the trial court did not err in admitting the amended declaration.

WSN contends that the trial court erred in granting summary judgment because facts Nos. 21 through 23 in respondents' separate statement are merely conclusory. We disagree. Generally, "[t]he requirement of a separate statement from the moving party and a responding statement from the party opposing summary judgment serves two functions: to give the parties notice of the material facts at issue in the motion and to permit the trial court to focus on whether those facts are truly undisputed." (*Parkview Villas Assn., Inc. v. State Farm Fire & Casualty Co.* (2005) 133 Cal.App.4th 1197, 1210 [35 Cal.Rptr.3d 411] (*Parkview Villas*).) Here, facts Nos. 21 through 23 gave WSN notice that respondents contended that WSN could not prove that C2B had performed under the agreement, and identified respondents' evidence for these factual allegations. Instead of pointing to admissible evidence on this matter, WSN objected to facts Nos. 21 through 23 as conclusory and argumentative. As we have explained, respondents' showing shifted the burden to WSN to raise a triable issue, which WSN failed to carry.

WSN's reliance on *Cassady v. Morgan, Lewis & Bockius LLP* (2006) 145 Cal.App.4th 220 [51 Cal.Rptr.3d 527] (*Cassady*) and *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763 [107 Cal.Rptr.2d 617, 23 P.3d 1143] (*Saelzler*) is misplaced, as these cases are factually distinguishable. In *Cassady*, a client sued an attorney and his law firm for malpractice. (*Cassady, supra*, 145 Cal.App.4th at p. 224.) When the law firm declined to pay for the attorney's defense, the attorney sought indemnification from the law firm for his defense expenses. (*Ibid.*) After the law firm secured summary judgment on the attorney's claim, the attorney filed a successful motion for a new trial. (*Ibid.*) To establish that the grant of summary judgment had been proper, the law firm argued that the attorney lacked evidence regarding his services for the law firm, pointing to his admissions in discovery that his billing records did not itemize his time. (*Id.* at p. 243.) The appellate court held that these admissions were insufficient to carry the law firm's initial burden on summary judgment, reasoning that the attorney could provide evidence regarding his services in other ways. (*Ibid.*) In contrast, respondents' showing on summary judgment adequately showed that WSN had no reasonable access to evidence that C2B had performed under the agreement.

In *Saelzler*, the plaintiff was injured while in an apartment building that lacked security measures, even though the apartment was located in a high-crime district. (*Saelzler, supra*, 25 Cal.4th at pp. 766–767.) When the plaintiff sued the building's owners for negligence, the owners sought summary judgment on the theory that the plaintiff could not identify her assailants, and thus had no evidence that the absence of security measures caused her injuries. (*Id.* at p. 769.) After the trial court granted summary judgment, the Court of Appeal reversed, reasoning that the absence of security measures was sufficient, in itself, to raise a triable issue regarding causation. (*Id.* at p. 771.) Our Supreme Court reversed, reinstating the trial court's grant of summary judgment and holding that the Court of Appeal's rationale incorrectly altered the parties' burdens of proof on summary judgment, and denied the owners the opportunity to carry their initial burden by showing that the plaintiff lacked evidence of causation. (*Id.* at p. 780.) Consistent with *Saelzler*, the trial court below correctly determined that respondents had shifted the burden to WSN to present evidence of C2B's performance, and that WSN failed to do so.

WSN contends that various facts that were undisputed by respondents raised triable issues regarding C2B's performance. Respondents' separate statement contended that the following facts were not in dispute: in deposition, Alon Nachom provided a general description of the POPS system, as used for the agreement (fact No. 28a); NYT paid C2B in excess of $1.5

million under the agreement, yet only 187 out of the 45,311 subscription submissions resulted in paid subscriptions to the New York Times (fact No. 6); C2B forwarded subscription submissions at a greater rate when NYT increased the fees for the submissions (fact No. 8); and NYT terminated the agreement after C2B exceeded the targeted number of subscription submissions (fact No. 13). Additionally, in response to WSN's separate statement, respondents did not dispute that NYT approved an increase in the fee for submissions (fact No. 44), and that Chris Kramer did not talk to Michael Keenan about the quality of C2B's submissions on September 16, 2003, when NYT instructed NETexponent to terminate the agreement (fact No. 25).

None of these facts raises a triable issue as to whether C2B obtained the information it sent to NYT through the POPS system, as required by the agreement. Although Alon Nachom provided a general description of the POPS system, he otherwise testified that he was not a "technical person," that he relied on others for information about the actual workings of the system, and that he was unaware of records regarding the system. The trial court sustained respondents' objections to Alon Nachom's testimony, insofar as WSN offered this testimony as evidence of C2B's actual performance under the agreement, and WSN has not challenged these rulings on appeal. The remaining undisputed facts show that NYT processed C2B's submissions without significant complaint for a considerable period, but have no bearing on the origins of the submissions.[7]

---

[7] WSN also contends that various admissions NYT made in opposing C2B's motion for summary judgment raise triable issues regarding C2B's performance. NYT's separate statement in opposition to C2B's motion accepted the following facts as undisputed: to boost the number of C2B's subscriptions, NYT agreed to allow C2B to modify its pop up ads to allow subscribers more payment options (fact No. 36); NYT's subscription fulfillment agent kept a running tally of C2B's subscription submissions that could not be processed (fact No. 51); in early September 2003, respondents met with Alon Nachom to address problems with the quality of C2B's submissions and to finds ways of enhancing the number of C2B's submissions (fact No. 60); after the meeting, C2B's submission rate increased (facts Nos. 61 & 62); C2B continued to forward submissions after NYT cancelled the agreement (fact No. 63); and NYT paid C2B more than $1.5 million for the submissions. Moreover, in opposing C2B's summary judgment motion, NYT conceded that there were triable issues as to whether NYT accepted or rejected C2B's submissions, whether NYT revoked the agreement in a timely fashion, and whether NYT waived its right to assert a breach of contract claim against C2B to obtain restitution of the fees it had paid. Finally, WSN points to NYT's notice canceling the agreement, which asserted that WSN had exceeded a quota for submissions.

These admissions do not raise triable issues regarding C2B's performance for the purposes of WSN's breach of contract claim against NYT. As we explain below (see pt. E.1., *post*), the trial court, in assessing respondents' summary judgment motion, was not obliged to examine evidence outside the separate statements. We see no error in the trial court's failure to consider evidence filed in connection with C2B's motion. (See *Artiglio v. General Electric Co.* (1998) 61 Cal.App.4th 830, 841–842 [71 Cal.Rptr.2d 817]; *Maryland Casualty Co. v. Bailey & Sons, Inc.* (1995) 35 Cal.App.4th 856, 870, fn. 11 [41 Cal.Rptr.2d 519].) Moreover, NYT's admissions do not raise any reasonable inference regarding the origins of C2B's submissions to NYT.

■ WSN contends that C2B's submissions constitute "goods" under California's version of the Uniform Commercial Code (UCC), and that C2B's performance must therefore be assessed under the principles applicable to contracts for the sale of goods under the UCC. The crux of WSN's argument is that there are triable issues as to whether NYT *accepted* the goods—i.e., the submissions—under the UCC by failing to reject them in a timely manner (Cal. U. Com. Code, § 2606, subd. (1)). We disagree. "It is established that where the commercial agreement between the parties involves the performance of services, the [California Uniform] Commercial Code has no application. [Citations.]" (*North American Chemical Co. v. Superior Court* (1997) 59 Cal.App.4th 764, 781 [69 Cal.Rptr.2d 466].) As explained below, the agreement before us involves the provision of services, not the sale of goods.

■ Under the California Uniform Commercial Code, the term "goods" encompasses "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities . . . and things in action." (Cal. U. Com. Code, § 2105, subd. (1).) In determining whether the agreement was for the sale of goods or the provision of services, " 'we must look to the "essence" of the agreement. When service predominates, the incidental sale of items of personal property[] does not alter the basic transaction.' " (*Filmservice Laboratories, Inc. v. Harvey Bernhard Enterprises, Inc.* (1989) 208 Cal.App.3d 1297, 1305 [256 Cal.Rptr. 735], quoting *North American Leisure Corp. v. A & B Duplicators, Ltd.* (2d Cir. 1972) 468 F.2d 695, 697.) Here, the agreement stated that NYT and C2B "intend[ed] to form a business relationship whereby [NYT] advertises and promotes its products and services on C2B's POPS[] cross selling system in return for a fee from [NYT] to C2B." Under the agreement, C2B was obliged to place pop up ads at the Web sites of its marketing partners, and then relay information from customers who responded to the ads to NYT.

■ Although no California court has confronted the issue presented here, other state courts have concluded that contracts for the placement of advertising do not involve the sale of goods under the UCC. (*Directory v. Lake Country* (N.Y.Sup.Ct. 2002) 193 Misc.2d 799 [753 N.Y.S.2d 660, 662–663] [contract for the placement of advertisements in yellow pages is for services and not for sale of goods]; *Lochabay v. Southwestern Bell Media* (Tex.App. 1992) 828 S.W.2d 167, 171 [same]; *Southwestern Bell Telephone v. FDP Corp.* (Tex. 1991) 811 S.W.2d 572, 576 [same]; *Vails v. Southwestern Bell Tel. Co.* (W.D.Okla. 1980) 504 F.Supp. 740, 743 [same].) Moreover, other courts have held that contracts for the transmission of data from an external source

are for services. (*Kaplan v. Cablevision of Pa, Inc.* (1996) 448 Pa.Super. 306 [671 A.2d 716, 722–723] [contract for provision of television programs via cable is for services]; *Whitmer v. Bell Telephone Co. of Pa.* (1987) 361 Pa.Super. 282 [522 A.2d 584, 585] [contract for use of public pay phone is for services].) In a case similar to this one, *Pichey v. Ameritech Interactive Media Services* (W.D.Mich. 2006) 421 F.Supp.2d 1038, 1041–1042, an Internet Web site designer agreed to create a Web site for a furniture retailer that would advertise the retailer's products, and permit interested parties to contact the retailer by e-mail. The court concluded that the contract was for services, and thus fell outside the scope of the UCC. (421 F.Supp.2d at p. 1050.) We reach the same conclusion here.

Pointing to *Big Farmer, Inc. v. Agridata Resources, Inc.* (1991) 221 Ill.App.3d 244 [163 Ill.Dec. 629, 581 N.E.2d 783], WSN contends that C2B provided goods to NYT because it identified potential subscribers to the New York Times, and was paid a fee for each potential subscriber. In *Big Farmer*, the publisher of a farming magazine bought a list of farmers within an income group from a business that sold demographic information and mailing lists, and used the list to solicit potential subscribers. (*Id.,* 581 N.E.2d at p. 784.) The parties subsequently fell into a dispute about whether the purchase agreement obliged the publisher to pay a fee for each name on the list, or each new subscriber. (*Id.* at p. 784.) The court concluded that the names and addresses sold constituted "goods" because they were "moveable." (*Id.* at p. 785.) Here, C2B did not sell NYT names and addresses of persons to whom NYT intended—by its own efforts—to send solicitations for subscriptions; rather, C2B agreed to solicit subscribers for NYT by placing subscription advertisements for NYT in designated locations, and to forward responses to the advertisements. Whereas the provider in *Big Farmer* sold personal information it had compiled, C2B merely promised to transmit information from customers of C2B's marketing partners who chose to provide the information through the pop up ads. In our view, C2B thus agreed to provide a service for NYT. That NYT paid a fee for each submission does not establish that the submissions constituted "goods." (See *Brown v. Lee* (1967) 242 Ark. 122 [412 S.W.2d 273, 274] [agreement that obliged a housebuilder to pay a commission for each building contract a broker obtained for the housebuilder was not for sale of goods].)[8]

---

[8] WSN also suggests that triable issues regarding NYT's performance under the agreement preclude summary judgment, even if the contract is for services. Pointing to *Overton v. Vita-Food Corp.* (1949) 94 Cal.App.2d 367 [210 P.2d 757] (*Overton*), reversed on another point in *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 866, footnote 2 [44 Cal.Rptr. 767, 402 P.2d 839], WSN contends that NYT's failure to warn C2B that its submissions were defective interfered with C2B's ability to perform under the agreement. In *Overton*, an employer voluntarily closed its plant and declined to pay an employee's salary, citing a term in the pertinent employment contract that permitted the employer to withhold the salary for plant closures due to "emergent conditions" beyond the employer's reasonable control. (*Overton,*

### E. *Proper Exclusion of Other Evidence*

WSN contends that the trial court improperly failed to consider the deposition testimony of Kobi Nachom, Donald Cerullo, Jr., and Brian Nelson in granting summary judgment and denying the new trial motion. We disagree.

#### 1. *Underlying Proceedings*

Respondents filed their motion for summary judgment on or about December 3, 2004. Kobi Nachom's deposition occurred on February 1, 2005. On February 4, 2005, WSN filed its opposition to respondents' summary judgment motion. It neither identified material testimony from Kobi Nachom's deposition nor sought an extension of time within which to file the opposition.[9] Respondents' reply noted that Kobi Nachom's deposition predated the filing of the opposition, and that WSN had not included a declaration from Kobi Nachom with its opposition.[10]

Cerullo and Nelson were deposed on April 1, 2005. At the April 5 hearing on respondents' summary judgment motion, WSN's counsel argued that Cerullo's, Nelson's, and Kobi Nachom's deposition testimony raised triable issues regarding C2B's performance, and he read from Kobi Nachom's deposition to the trial court. The trial court found that WSN had failed to explain why it had submitted no declaration from Kobi Nachom, and declined to consider the deposition testimony from Kobi Nachom, including the excerpts included with respondents' reply.

---

*supra,* at pp. 368–369.) The appellate court concluded that the voluntary plant closure was not an "emergent condition," reasoning that "[a] party to a contract cannot take advantage of his own act or omission to escape liability thereon." (*Id.* at p. 371.) Here, there is no evidence that respondents prevented C2B from performing in accordance with the agreement, that is, from deriving the submitted information from customers of C2B's marketing partners.

Citing *Kotler v. PacifiCare of California* (2005) 126 Cal.App.4th 950 [24 Cal.Rptr.3d 447] (*Kotler*), WSN also argues that NYT did not terminate the agreement in accordance with its terms, which permitted either party to terminate the agreement "for good cause upon 60 days written notice to the other party." In *Kotler,* the plaintiff sued his health care provider for breach of contract, alleging that the provider failed to refer him to a specialist in a timely manner. (*Id.* at pp. 952–955.) The appellate court reversed a grant of summary judgment for the provider, concluding there were triable issues whether it had provided care to the plaintiff in a reasonably prompt manner. (*Id.* at p. 956.) Here, unlike *Kotler,* the dispositive question on summary judgment is whether C2B performed under the agreement. Because WSN provided *no* evidence that C2B performed under the agreement—a necessary predicate for recovery on WSN's breach of contract claim—any triable issue whether NYT properly terminated the agreement does not preclude summary judgment in respondents' favor.

[9] The opposition stated that the deposition "[had] yet to be taken," though, in fact, it had taken place days earlier.

[10] Respondents submitted excerpts from Kobi Nachom's deposition with their reply, but did not assert any argument on the basis of his testimony. Later, WSN lodged a complete transcript of the deposition.

In granting summary judgment, the trial court stated: "[A]t oral argument, counsel for WSN argued for the first time that the deposition testimony of . . . Kobi Nachom, Donald Cerullo and[] Brian Nelson established C2B's performance. . . . The Court finds that none of this testimony is properly before the Court. While WSN did lodge the entire transcript of Kobi Nachom's deposition with the Court before the hearing, it did so long after the deadline for the filing of WSN's opposition had passed. There was no citation to any testimony from Kobi Nachom submitted in opposition to NYT's summary judgment motion." The trial court also found that WSN never sought a continuance nor presented an adequate basis for a continuance. It subsequently denied WSN's motion for a new trial.

### 2. *Ruling on Summary Judgment*

WSN contends that the trial court improperly granted summary judgment without considering the portions of Kobi Nachom's deposition identified by WSN's counsel at the hearing on respondents' summary judgment motion. In our view, the trial court did not err.

The courts are divided regarding a trial court's authority to consider evidence not addressed in a party's separate statement. Under the summary judgment statute, the moving party's separate statement must set forth all purported undisputed facts, "followed by a reference to the supporting evidence"; similarly, the opposing party's separate statement must identify facts it disputes, and refer to the supporting evidence. (§ 437c, subd. (b)(1), (3).) The statute accords the trial court discretion to deny or grant the motion when, respectively, the moving party or the opposing party fails to comply with "this requirement of a separate statement." (*Ibid.*) The statute also obliges the trial court to consider "all . . . papers submitted" in ruling on the motion, and states: "In determining whether the papers show that there is no triable issue as to any material fact the court shall consider all of the evidence set forth in the papers, except that to which objections have been made and sustained by the court . . . ." (§ 437c, subd. (c).)

In *United Community Church v. Garcin* (1991) 231 Cal.App.3d 327, 335 [282 Cal.Rptr. 368] (*Garcin*), the court concluded that the statutory requirements concerning the presentation of facts and citation of evidence in separate statements are enforced to afford due process to opposing parties and to facilitate the trial court's review of motions for summary judgment. The court thus held that the trial court in the case before it had improperly granted a motion for summary adjudication on the basis of facts not properly identified in the moving party's separate statement. (*Id.* at pp. 337–338.) In so ruling, the court embraced the so-called " 'Golden Rule,' " that is, " 'if it is not set forth in the separate statement, *it does not exist.*' " (*Id.* at p. 337.)

Subsequently, the court in *North Coast Business Park v. Nielsen Construction Co.* (1993) 17 Cal.App.4th 22, 30–32 [21 Cal.Rptr.2d 104], reasoned that the Golden Rule encompassed deficiencies in the opposing party's separate statement, and concluded that a party opposing summary judgment must identify pertinent issues and evidence in its separate statement of facts. The court stated: " '[I]t is no answer to say the facts set out in the supporting evidence or memoranda of points and authorities are sufficient. "Such an argument does not aid the trial court at all since it then has to cull through often discursive argument to determine what is admitted, what is contested, and where the evidence on each side of the issue is located." ' [Citation.]" (*Id.* at p. 30, quoting *Garcin, supra,* 231 Cal.App.3d 327, 335.)

In *San Diego Watercrafts, Inc. v. Wells Fargo Bank* (2002) 102 Cal.App.4th 308, 315–316 [125 Cal.Rptr.2d 499], the court departed from *Garcin,* concluding that trial courts may consider evidence outside the separate statements in granting summary judgment. There, the moving party submitted new evidence with his reply, and the trial court granted summary judgment on the basis of the evidence, even though it was not cited in the separate statements. (*Id.* at p. 312.) Following an analysis of the summary judgment statute, the appellate court reasoned that the trial court was neither obliged to consider the new evidence, nor obliged to ignore it (contrary to *Garcin*). (*Id.* at pp. 312–317.) Pointing to the provision permitting the denial of summary judgment due to defects in the moving party's separate statement, the court concluded that the summary judgment statute accords trial courts discretion to consider evidence not mentioned in the separate statements in granting summary judgment. (*Id.* at p. 315.) In exercising this discretion, the trial court must weigh the due process implications considering evidence outside the separate statements, and may disregard evidence when it "is not referenced, is hidden in voluminous papers, and is not called to the attention of the court at all." (*Id.* at p. 316.) Applying this analysis to the case before it, the court reversed the summary judgment, concluding that the trial court had denied the opposing party due process by considering evidence after the opposing party had filed its opposition. (*Ibid.*)

Here, WSN contends that the trial court improperly declined to consider Kobi Nachom's deposition testimony in granting summary judgment. Assuming—without deciding—that *San Diego Watercrafts* also establishes that the trial court was permitted to consider the deposition testimony, we see no abuse of discretion.[11] We note that Kobi Nachom, as C2B's employee, was

---

[11] Pointing to the statutory requirement that the trial court must "consider all of the evidence set forth in the papers" (§ 437c, subd. (c)) and *Weiss v. Chevron, U.S.A., Inc.* (1988) 204 Cal.App.3d 1094 [251 Cal.Rptr. 727] (*Weiss*), WSN contends that the trial court was *obliged* to consider the deposition testimony. This contention fails in light of the statutory provision permitting the trial court to grant summary judgment due to defects in the opposing party's

available to provide a declaration to WSN, which was closely allied with C2B in the action.[12] Moreover, although Kobi Nachom's deposition was completed before WSN filed its opposition, WSN neither incorporated his testimony in its opposition, nor sought a continuance to do so. Respondents' reply mentioned the deposition, but argued only that (1) the deposition occurred on February 1, 2005, after they obtained an order compelling the deposition, and (2) WSN had failed to submit a declaration from Kobi Nachom with its opposition. Although respondents included excerpts from the deposition with their reply, they did not rely on the excerpts to show the nonexistence of triable issues; moreover, the excerpts do not raise a triable issue regarding C2B's performance.[13] At the hearing on the motion, WSN contended for the first time that portions of the deposition testimony raised triable issues regarding C2B's performance. In our view, the trial court properly concluded that the belatedly identified deposition testimony could not be considered for this purpose.

WSN suggests that the trial court should have accorded it an opportunity to amend its opposition, citing *Parkview Villas, supra*, 133 Cal.App.4th 1197. There, the party opposing summary judgment submitted a separate statement that failed to identify the precise portions of the evidence supporting its contentions about disputed facts. (*Id.* at p. 1210.) Neither the moving party nor the trial court pointed to any deficiency in the separate statement prior to the ruling on the motion, and the moving party's reply brief demonstrated a full awareness of the evidence supporting the opposing party's contentions. (*Id.* at pp. 1206–1208, 1210–1213.) After the trial court granted the motion based on the deficiencies in the separate statement, the appellate court reversed, reasoning that the trial court erred in ruling on the motion without

---

separate statement (§ 437c, subd. (b)(3)). Nothing in *Weiss* suggests that trial courts must consider the entire body of evidence, regardless of the implications for due process. In *Weiss*, the moving party omitted a declaration from its initial showing but submitted the declaration with its reply, along with a request that the opposing party be permitted to depose the declarant and file an amended opposition. (*Weiss, supra*, 204 Cal.App.3d at p. 1097.) After the trial court continued the hearing on the motion, it granted summary judgment. (*Ibid.*) The appellate court affirmed, reasoning that the trial court had properly considered evidence "of which the opposing party . . . had notice and the opportunity to respond." (*Id.* at pp. 1098–1099.)

[12] C2B joined in WSN's opposition to respondents' motion for summary judgment.

[13] WSN's briefs on appeal improperly conflate answers to different questions—separated by several pages of transcript—into a single response. Nothing within the excerpts shows that the submissions C2B sent to NYT were, in fact, derived from customers of C2B's marketing partners. According to the excerpts, Kobi Nachom testified that he was responsible for C2B's computer system in New Jersey. He worked in Los Angeles and never went to New Jersey. When asked what kind of work he had done that involved NYT, he responded: "I was responsible for all kinds of batch filing of invitations, and I was a liaison to make sure that everything was operating properly." He also testified: "Again, the system, I saw how it was working. Yes, I saw how the system was working, and that's it. And after that, I handled all the windows, those specific windows, and the orders. I was in charge of the orders, this whole subject of the orders, and to make sure that there are no duplications of orders."

according the opposing party an opportunity to cure the purely technical defects in its separate statement. (*Id.* at pp. 1210–1216.) No such technical defect is present here. Although Kobi Nachom's deposition occurred two months before the hearing on respondents' motion, WSN never suggested his testimony raised triable issues until the hearing, well after briefing on the motion had ended.

### 3. *Ruling on New Trial Motion*

WSN also contends that the trial court improperly failed to consider the deposition testimony of Cerullo, Nelson, and Kobi Nachom in denying the new trial motion. The crux of WSN's argument is that the statutes governing new trial motions obliged the trial court to consider *all* the evidence in the record in determining the existence of triable issues, regardless of whether this evidence was properly before the trial court when it ruled on respondents' summary judgment motion. As explained below, WSN is mistaken.

■ Sections 657 and 658 establish seven grounds for a new trial, which fall into two groups. Motions seeking a new trial on the first four grounds "must be made upon affidavits" (§ 658). Pertinent to our analysis is the fourth ground. Subdivision 4 of section 657 permits the trial court to grant a new trial upon an adequate showing of "[n]ewly discovered evidence, material for the party making the application, which he could not, with reasonable diligence, have discovered and produced at the trial." Generally, a party seeking a new trial on this basis must show that "(1) the evidence is newly discovered; (2) he or she exercised reasonable diligence in discovering and producing it; and (3) it is material to the . . . party's case." (*Plancarte v. Guardsmark* (2004) 118 Cal.App.4th 640, 646 [13 Cal.Rptr.3d 315].)

In contrast, motions relying on the remaining three grounds "must be made on the minutes of the court." (§ 658.) Here, "[t]he 'minutes of the court' include the records of the proceedings entered by the judge or courtroom clerk, showing what action was taken and the date it was taken [citation] and may also include depositions and exhibits admitted into evidence and the trial transcript. [Citation.]" (*Lauren H. v. Kannappan* (2002) 96 Cal.App.4th 834, 839, fn. 4 [117 Cal.Rptr.2d 484].) Pertinent here are the sixth ground, which encompasses "[i]nsufficiency of the evidence" and the existence of a decision "against law" (§ 657, subd. 6), and the seventh ground, namely, "[e]rror in law, occurring at the trial and excepted to by the party making the application" (§ 657, subd. 7). Generally, these grounds permit a party to assert various deficiencies in a ruling, including the absence (or presence) of substantial evidence to support a factual determination, and errors in admitting or excluding evidence. (See 8 Witkin, Cal. Procedure, *supra*, Attack on Judgment in Trial Court, §§ 42–45, pp. 548–552.)

Here, WSN sought a new trial solely on the basis of the sixth and seventh grounds, and it does not suggest on appeal that the motion met the requirements for relief under the fourth ground. WSN has thus forfeited any contention that the deposition testimony of Cerullo, Nelson, and Kobi Nachom constituted "newly discovered evidence" within the meaning of the statutes governing new trial motions. WSN contends only that the trial court, in assessing the sixth and seventh grounds for a new trial, was obliged to consider the testimony in determining the existence of triable issues because it is found within "the minutes of the court" (§ 658). In support of this contention, WSN notes that transcripts of the depositions were lodged with the trial court, which acknowledged the existence of the depositions in the order granting summary judgment and subsequent rulings on other matters; in addition, WSN points to the judicial policy favoring the disposition of cases on their merits.

This contention is meritless. As our Supreme Court has explained, "[t]he right to a new trial is purely statutory, and a motion for a new trial can be granted only on one of the grounds enumerated in the statute." (*Fomco, Inc. v. Joe Maggio, Inc.* (1961) 55 Cal.2d 162, 166 [10 Cal.Rptr. 462, 358 P.2d 918].) Because new trial motions are creatures of statute, " 'the procedural steps . . . for making and determining such a motion are mandatory and must be strictly followed [citations].' " (*Linhart v. Nelson* (1976) 18 Cal.3d 641, 644 [134 Cal.Rptr. 813, 557 P.2d 104], quoting *Mercer v. Perez* (1968) 68 Cal.2d 104, 118 [65 Cal.Rptr. 315, 436 P.2d 315].) As we have explained, the fourth statutory ground establishes the requirements for obtaining a new trial on the basis of evidence not before the trial court when judgment was rendered. These requirements are applicable to parties seeking a new trial following summary judgment. (*Scott v. Farrar* (1983) 139 Cal.App.3d 462, 467 [188 Cal.Rptr. 823].) To accord a new trial to a party who asserts the existence of fresh evidence in "the minutes of the court" (§ 658) but fails to meet the requirements for newly discovered evidence, would render the fourth statutory ground a nullity. We decline to do so.

### F. *Fee Award*

WSN attacks the fee award solely on the ground that the trial court erred in granting summary judgment and denying the new trial motion. In view of our determinations regarding these matters, the fee award was proper.

## DISPOSITION

The judgment and fee award are affirmed.

Epstein, P. J., and Willhite, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 22, 2008, S166072. Werdegar, J., did not participate therein.