Filed 2/26/14  Beraze v. Wilshire Landmark CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| ISAK BERAZE, et al., | B243782 |
| Cross-complainants and Appellants, | (Los Angeles County Super. Ct. No. BC365315) |
| v. | |
| WILSHIRE LANDMARK, LLC, et al., | |
| Cross-defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jane L. Johnson, Judge.  Reversed and remanded.

Meylan Davitt Jain & Arevian, Vincent J. Davitt and Anita Jain; Anderson McPharlin & Connors, Michael S. Robinson and D. Damon Willens, for Cross-complainant and Appellant.

Orbach, Huff & Suarez, David M. Huff, Enrique M. Vassallo and Niv V. Davidovich, for Cross-defendants and Respondents.

_____

Webcor Construction executed a contract with Wilshire Landmark to construct a condominium tower. Before the project was complete, Wilshire presold each of the condominium units to individual buyers. Wilshire used the buyers' purchase funds to pay off its construction loans and distributed the remaining funds to its member entities. After the project was complete, Webcor recorded a $17.5 million mechanics lien against the condominium tower for unpaid labor and materials. In 2007, Webcor filed a complaint asserting claims for breach of contract against Wilshire and foreclosure of its mechanics lien against Wilshire and the individual condominium unit owners. The unit owners filed a cross-complaint seeking indemnification from Wilshire and its "alter ego" member entities for any losses resulting from Webcor's mechanics lien claim. The cross-complaint alleged that although Wilshire was aware it owed Webcor a substantial sum for construction costs incurred on the project, it chose to distribute the remaining purchase funds to its alter ego member entities as profits. The cross-complaint further alleged that, as a result of this conduct, Wilshire had harmed the unit owners by exposing them to potential liability on Webcor's mechanics lien claim.

Wilshire filed a motion for summary judgment or, in the alternative, summary adjudication, on the cross-complaint arguing that the unit owners could not prevail on any of their claims because: (1) there was no evidence any unit owner had suffered harm as a result of Webcor's pending mechanics lien claim; and (2) any future loss the unit owners might suffer as a result of the mechanics lien claim would be covered by title insurance. The trial court granted the motion and entered judgment in favor of Wilshire.

On appeal, the unit owners argue the trial court erred in granting summary adjudication on three of its claims: (1) violation of California's unfair competition law (Business and Professions Code, § 17200 (the UCL)); (2) breach of the implied covenant against encumbrances (Civil Code, § 1113); and (3) equitable indemnity. We affirm in part and reverse in part, concluding that Wilshire failed to satisfy its initial burden to show the nonexistence of any triable issue of material fact regarding the unit owners' UCL claim, but affirming the trial court's grant of summary adjudication on the remainder of the unit owners' claims.

# FACTUAL AND PROCEDURAL BACKGROUND

### A. The Unit Owners' Cross-Complaint

Wilshire Landmark LLC (Wilshire) was created in July of 2002 to develop a condominium tower known as "The Californian" (the project). Wilshire was owned by three member entities: FRC Wilshire, FRC Wilshire Holdings and CLD Wilshire High Rise (CLD). Each of these member entities signed an "Operating Agreement" governing their relationship. On October 31, 2003, Wilshire executed a contract with Webcor Construction to construct the project.

Between August of 2004 and June of 2005, Wilshire sold all of the condominium units in the project to 73 individual buyers. The terms of each sale were governed by a "Purchase and Sale Agreement" (PSA) that included escrow instructions. The escrow instructions stated, in part, that title to the unit would not be conveyed to the buyer until either "the statutory period for recordation of all mechanic's[1] lien claims ha[d] expired," or until Wilshire [had] provided a title insurance policy "insuring Buyer . . . against unrecorded mechanic's liens." Wilshire subsequently provided each buyer a title insurance policy that included an endorsement providing coverage against losses sustained by liens or encumbrances on title up to the purchase price of the condominium unit. Between May and June of 2006, Wilshire conveyed title to each of the condominium unit owners pursuant to the PSA and the unit owners' purchase funds were released to Wilshire.

Wilshire used the purchase funds to pay off construction loans, leaving it with a balance of $25 million. Between August and November of 2006, Wilshire distributed approximately $15.5 million to its member entities and withheld approximately $9.5 million to cover its remaining debts.

---

[1] Both parties use an apostrophe when referring to the term "mechanic's lien." In 2008, however, the California Legislature adopted legislation reorganizing and amending the mechanics lien law. Although the legislation retains the use of the term "mechanics lien," it "drops the apostrophe." (See 37 Cal. L. Revision Comm'n Reports 527, 559 (2007).) Accordingly, we use the term "mechanics lien" except when quoting the parties' briefs, evidence or prior case law.

During the course of construction, Webcor and Wilshire became involved in a payment dispute. The dispute began in 2004 and continued until 2007, when Webcor walked off the job, forcing Wilshire to hire another contractor to complete the work. On March 7, 2007, Webcor recorded a mechanics lien against the project in the amount of $17,571,750. Shortly after recording the lien, Webcor filed a complaint asserting claims for breach of contract against Wilshire and foreclosure of its mechanics lien against Wilshire and numerous current and former owners of condominium units at the Californian.

On April 30, 2010, the unit owner defendants filed a cross-complaint against Wilshire and its member entities, each of which were alleged to be "alter egos" of Wilshire.[2] The cross-complaint asserted numerous causes of action seeking repayment of any amounts the unit owners were found to owe Webcor on the mechanics lien claim, including: violation of the UCL (Bus. & Prof. Code, § 17200), fraudulent transfer of assets (Civ. Code, § 3439.04), improper distribution, breach of the implied covenant against encumbrances in deed transfers (Civ. Code, § 1113), equitable subrogation, equitable indemnity and contribution.[3]

The unit owners' UCL claim alleged Wilshire had "received purchase . . . funds from [the unit owners] which was [*sic*] intended, among other things, for the purpose of paying . . . to complete construction of the [p]roject." Wilshire allegedly "began diverting . . . funds received for completion of the [pr]oject to its members, all of whom knew of [Wilshire's] still outstanding payment obligations to [Webcor] for completion of the [p]roject . . . ." The cross-complaint alleged Wilshire's "diversion of funds and

___

[2] The cross-complaint also named Steven Fifield, who was the managing partner of Wilshire and two of Wilshire's member entities, and two other entities with which Fifield was affiliated. The unit owners asserted Fifield and his entities were also "alter egos" of Wilshire.

[3] The complaint also alleged causes of action for breach of fiduciary duties, breach of the implied covenant of good faith and fair dealing, constructive trust and declaratory relief. According to the unit owners' brief, however, these causes of action were "dismissed on demurrer" and are "not at issue in this appeal."

4

failure to complete improvements for which it had received funds from [the unit owners] was knowing, willful and deliberate." The cross-complaint further asserted that, as a result of this unfair conduct, the unit owners had been damaged "by, among other things, having their property potentially subject to foreclosure on [Webcor's] mechanic's lien [and] being subject to [Webcor's] $17.5 million claim for unpaid labor and materials as a result of [Wilshire's] failure to fulfill its contract with [Webcor]. . . ."

The unit owners' claim for "breach of the implied covenants in deed transfers" (Civ. Code, § 1113) alleged that "at the time . . . title [was] conveyed . . . to the condominium units," Wilshire had "already acted in such a manner as to give [Webcor] the inchoate right to assert mechanic's liens upon the units." It further alleged that, "having provided to [Webcor] the right to encumber the [unit owners'] units by mechanic's liens, which were later . . . perfected by [Webcor], [Wilshire] violated the implied covenant in deed transfer set forth in Civil Code § 1113."

The unit owners' claim for equitable indemnity alleged Wilshire was "primarily responsible for the damages if any, for which [Webcor] complains." The claim further alleged that if the unit owners were found liable to Webcor, they were "entitled to be indemnified and held harmless under the principles of equitable indemnity by [Wilshire], either from all the damages or from a percentage based upon principles of comparative fault. . . ."

In their prayer for relief, unit owners requested, among other things, restitution and indemnification for any sum of money Webcor recovered against them on its claim for foreclosure of its mechanics lien.

### B.  Stipulation Regarding Unit Owner Subdivision Groups

After the unit owners filed their cross-complaint, the parties entered into a stipulation agreeing that the unit owners  consisted of "individuals, trustees, and entities" who had been named in Webcor's complaint and "own or once owned title to one or more units in . . .The Californian." The parties further stipulated that they had agreed to divide the unit owners into different groups, which were defined as follows:

"Group '1':   Unit owners who received title to their units in the Project from Wilshire and still hold title to those units.

Group '2':   Unit owners who did not receive title to their units in the Project from Wilshire, but still hold title to those units.

Group '3':   Unit owners who received title to their units in the Project from Wilshire, but no longer hold title to those units."[4]

The stipulation included an attachment showing that Group 1 was comprised of 66 current unit owners, Group 2 was comprised of 23 current unit owners and Group 3 was comprised of 11 former unit owners.

### C. *Wilshire's Motions for Summary Judgment*

#### 1. *Summary of Wilshire's motions for summary judgment*

Wilshire filed separate motions for summary judgment, or in the alternative, summary adjudication, against each group of owners.[5]  The parties stipulated, however, that the three motions presented identical arguments on most of the unit owners' claims, differing only with respect to the issue of standing on two of the unit owners' claims: violation of the UCL and breach of the implied covenant against encumbrances.

##### a. *Summary of Wilshire's arguments on the UCL claim*
###### i. *Lack of standing under the UCL*

Wilshire argued that all three groups of unit owners lacked standing to assert a UCL claim because none of them had lost "lost money or property" within the meaning of Business and Professions Code section 17204.  (See § 17204 ["Actions for relief

---

[4]   The stipulation described a fourth group of owners comprised of individuals who had not purchased their units from Wilshire and no longer held title to their units. Although the Group 4 owners initially joined in this appeal, they have since elected to "voluntarily dismiss the[ir] appeal. . . as to all causes of action."

[5]   The other cross-defendants, which included Wilshire's member entities and various other parties alleged to be liable to the unit owners under an alter ego theory, joined in the motions.

pursuant to this chapter shall be prosecuted exclusively . . . by . . . a person who has suffered injury in fact and has lost money or property as a result of the unfair competition"].)

Wilshire argued there were two reasons why Group 1 owners lacked standing to assert their UCL claim challenging Wilshire's decision to distribute the remaining purchase funds to its member entities. First, Wilshire contended the Group 1 owners had suffered no loss of money or property as a result of the distributions because each owner had received exactly what they contracted for: "title to their unit in exchange for the sums paid."

Second, Wilshire argued the parties' undisputed evidence demonstrated the Group 1 owners had not yet suffered, and would not suffer, the loss of any money or property as a result of Webcor's mechanics lien claim. Wilshire explained that: "(1) [the unit owners'] attorney fees are not sufficient to establish economic injury . . . under the UCL . . . . ; (2) [the unit owners] have not [yet] been required to pay Webcor any money . . .; (3) [the unit owners] were provided title insurance policies by [Wilshire] that would insure them against any future loss to Webcor by virtue of the mechanic's liens . . . ; (4) . . . [the unit owners] maintain possession of their units . . . ."

In support of its assertion the Group 1 owners had not lost, and would not lose, any money or property, Wilshire cited to: (1) language in the PSA stating that the buyer would receive title to a condominium unit in exchange for the purchase funds; (2) discovery responses indicating the unit owners had no evidence that they had ever paid Webcor any amount for the mechanics lien claim; and (3) a stipulation in which the unit owners admitted that, as a condition of their purchase, Wilshire had provided a title insurance policy stating the insured would be covered against damage or loss sustained by reason of any defect in or lien or encumbrance on the title.

Wilshire asserted additional arguments as to why the Group 2 and Group 3 owners lacked standing to pursue their UCL claim. It argued Group 2 owners lacked standing because they had not bought their units from Wilshire and had never paid any money to Wilshire. Thus, according to Wilshire, there was "no relationship between whatever

7

funds the [Group 2 owners] may or may not have paid for their units and the money that [Wilshire] may have [improperly] distributed."

Wilshire argued the Group 3 owners lacked standing to assert a UCL claim because they had already sold their condominium units and were therefore not susceptible to any of the forms of injury alleged in the unit owners' UCL claim, all of which derived from potential liability arising from Webcor's mechanics lien.

### ii. Wilshire's alleged conduct did not violate the UCL

Wilshire also argued that, even if any of the unit owners had standing to assert a UCL claim, the conduct alleged in the cross-complaint did not constitute an "unfair" or "fraudulent" business practice within the meaning of Business and Professions Code section 17200.[6] Wilshire contended the conduct underlying the UCL claim–Wilshire's decision to distribute the remaining condominium purchase funds to member entities despite knowledge of its payment obligations to Webcor–was not an "unfair" business practice because the "distributions were made pursuant to contractual obligations." Wilshire contended its "Operating Agreement," which was signed by each of the member

---

[6] Wilshire also argued the unit owners had failed to state a claim under the UCL's "unlawful" prong. (See *Jenkins v. JP Morgan Chase Bank, N.A.* (2013) 216 Cal.App.4th 497, 520 ["The UCL's unlawful prong ""'borrows' violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable. [Citations.]" [Citation.]'"].) The cross-complaint alleged Wilshire's distribution of the purchase funds was "unlawful" because it violated Penal Code section 484b's prohibition against "the unlawful diversion of funds received for [construction] improvements." (*People v. Williams* (2013) 218 Cal.App.4th 1038, 1064.) The trial court, however, ruled the unit owners' cross-complaint failed to allege any conduct that violated section 484b. On appeal, the unit owners have presented no argument regarding the unlawful prong of section 17200, nor have they presented any argument regarding Penal Code section 484b. We therefore treat this portion of their UCL claim as abandoned. (See *Wall Street Network, Ltd. v. New York Times Co.* (2008) 164 Cal.App.4th 1171, 1177 (*Wall Street*) ["failure to address summary adjudication of a claim on appeal constitutes abandonment of that claim"]; *Los Angeles Equestrian Center, Inc. v. City of Los Angeles* (1993) 17 Cal.App.4th 432, 450 [summary resolution of causes of action not addressed in appellants' brief upheld because the "failure to discuss the theories on appeal constitutes an abandonment"].)

entities, required the distributions to be made at the time and in the manner Wilshire had made them. Wilshire asserted that because "[t]he reasons, motives and justifications for the distributions all flow from contractual requirements," Wilshire's conduct "in no way could they be construed as 'unfair' . . ." In support of its assertion the distributions were contractually required, Wilshire cited to letters it had received from CLD (a Wilshire member entity) asserting that the terms of the Operating Agreement required Wilshire to distribute the remaining purchase funds.

Wilshire also argued its decision to distribute the purchase funds to its member entities, rather than use them to pay Webcor, was not unfair because each unit owner had received a title insurance policy that would protect them from "any potential injury" resulting from Webcor's mechanics lien claim. According to Wilshire, the unit owners "could have and did avoid injury by obtaining title insurance which specifically protected them against any mechanic's liens that had yet been recorded such as Webcor's." In support, Wilshire cited to an endorsement in the title insurance policy covering losses sustained by reason of any defect in or lien or encumbrance on the title.

Wilshire also asserted the unit owners could not prevail under the fraudulent prong of the UCL because they had failed to "allege any misrepresentation" that it had made to the unit owners. It further argued that, to the extent the unit owners' "fraudulent" prong claim was based on Wilshire's failure to disclose it was distributing the remaining purchase funds to its member entities, the unit owners had not alleged Wilshire had any duty to disclose such information.

> b. *The unit owners' claim for breach of the implied covenant against encumbrances*

Wilshire argued that none of the unit owners could prevail on their claim that it had violated Civil Code section 1113's implied covenant against encumbrances by conveying property that was subject to Webcor's "inchoate right" to assert a mechanics lien.

9

Wilshire argued the Group 1 owners' implied covenant claim failed because the PSA contained express provisions explaining that title would not be conveyed until either the statutory period to record a mechanics lien claim had expired, or until Wilshire provided a title insurance policy covering losses attributable to any mechanics liens. According to Wilshire, this express language precluded application of any implied covenant the unit owners' title would be free from unrecorded mechanics liens.

Wilshire argued the Group 2 owners had no standing to assert a claim for breach of the implied covenant against encumbrances because they did not take title of their units from Wilshire. According to Wilshire, "[o]nly those parties in privity to a contract or deed have standing to sue on the contract or deed, or as to any implied covenants contained therein." Wilshire argued the Group 3 owners' implied covenant failed because they no longer held title to their units and therefore could not suffer any harm from Webcor's mechanics lien.

### c. Equitable indemnity

Wilshire argued the unit owners had "fail[ed] to state a cause of action" for equitable indemnity, contending the doctrine did not apply in the absence of some form of joint tort liability among the defendants. Wilshire asserted that because Webcor had "not alleged any actions in tort against the [u]nit [o]wners or [Wilshire]," the unit owners could not pursue an equitable indemnity claim.

### d. Failure to establish "alter ego" liability

Finally, Wilshire argued that the unit owners could not substantiate their claim that Wilshire's member entities were subject to "alter ego" liability for the acts Wilshire had committed. In sum, Wilshire contended the unit owners had failed to identify any evidence proving that a unity of interest existed among the various Wilshire member

entities, or that an inequitable result would follow if Wilshire's acts were treated as its alone.**7**

2. *The unit owners' oppositions to the motions for summary judgment*
    a. *The UCL claim*

The unit owners argued Wilshire had failed to introduce any evidence demonstrating they lacked standing to pursue their UCL claim. The Group 1 and 2 owners, who retained title to their units, argued that the cross-complaint specifically alleged various forms of economic injury that satisfied section 17204's "lost money or property" requirement, including "having a cloud on the title to their property," having their property "potentially foreclosed upon" and "diminution in value of their properties as a result of the liens . . ." The Group 2 owners further asserted that, for the purposes of

---

**7**     Wilshire also argued it was entitled to summary adjudication on the unit owners' four remaining claims for violation of the California Fraudulent Transfer Act (Civ. Code, § 3439 et seq.), improper distribution, equitable subrogation and contribution. The trial court agreed and granted summary adjudication on all four claims. The unit owners' opening appellate brief does not present any argument regarding these claims. "Generally, . . . [the] failure to address summary adjudication of a claim on appeal constitutes abandonment of that claim." (*Wall Street, supra,* 164 Cal.App.4th at p. 1177.) The unit owners' reply brief, however, contends they did not abandon these claims because their opening brief included language stating that although their arguments would "focus" on three claims dismissed by the trial court (violation of the UCL, breach of the implied covenant against encumbrances and equitable indemnity), they were appealing the "entire grant of Summary Judgment." Their reply brief contains no further argument regarding the claims that were not addressed in their opening brief. As the appellants, the unit owners had an affirmative duty to present a "cogent legal argument" regarding each claim they believed to have been erroneously dismissed in the trial court. (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 (*Cahill*).) "'We are not bound to develop appellants' argument for them. [Citation.]'" (*Ibid.*) The unit owners' assertion they were appealing "the entire grant of Summary Judgment" is insufficient to preserve claims they did not address in their briefing. (Cf., *Martinez v. County of Los Angeles* (1986) 186 Cal.App.3d 884, 887, fn. 2 [although appellant's "notice of appeal was filed as to . . . [a] judgment . . . which included a dismissal of the second cause of action," the appellant's failure to "address the propriety of the trial court's ruling with respect to the second cause of . . . . constitutes an abandonment of review thereof"].)

11

standing, it was immaterial whether they had personally engaged in any transaction with Wilshire "as it is the existence of the lien upon the property that caused the damage or injury to the unit owners, which was caused by the unfair . . . actions of [Wilshire]." The unit owners provided no argument, however, as to how Group 3 owners (who had sold their units) had sustained, or might sustain, a loss of money or property as the result of Webcor's pending mechanics lien claim.

The unit owners also argued Wilshire had failed to introduce any evidence demonstrating that its decision to pay out the remaining purchase funds to its member entities as profits was not an "unfair" business practice. The unit owners argued there were disputed issues of material fact as to whether Wilshire was contractually required to make the distributions pursuant to the terms of the Operating Agreement. They further argued that, even if the distributions were required under the agreement, there were disputed issues of fact as to whether Wilshire and its alleged alter ego member entities had utilized the Operating Agreement as a fraudulent mechanism to "siphon the unit owners' sale proceeds" to the alter ego liabilities without paying for the entire project and without providing the buyers with good title.

The unit owners also argued that "the existence of title insurance [was] completely irrelevant" to "determining whether [Wilshire] participated in an unfair business practice." According to the unit owners, the title insurance did not negate the injuries they had suffered as a result of Wilshire's conduct; the insurance merely provided a mechanism to redistribute the losses associated with those injuries.

The unit owners also argued they had properly asserted a claim under the "fraudulent" prong of section 17200 by alleging that, at the time Wilshire sold the units, it had concealed the existence of the "inchoate mechanics lien . . . and that recordation of the lien was imminent." The unit owners argued that by "decid[ing] to conceal this information . . . and take the [purchase funds as] . . . 'profit' distributions," Wilshire had "ensured that . . . . [u]nit [o]wners] would not receive the lien free units they contracted for . . ."

12

### b. Breach of the implied covenant against encumbrances

The unit owners also argued Wilshire had failed to demonstrate it was entitled to judgment on their claim for breach of the implied covenant against encumbrances. The Group 1 owners disputed whether the provisions of the PSA expressly informed buyers that title to their units was subject to unrecorded mechanics lien claims. Although the owners acknowledged the PSA stated that escrow would not close until either the statutory period for recording a mechanics lien had expired or upon Wilshire's procurement of title insurance protecting against mechanics liens, they contended this provision merely described the conditions necessary to close the escrow; it did not constitute an express limitation on title.

The Group 2 owners argued that although the implied covenant against encumbrances generally does not pass to a subsequent purchaser, the trial court retained equitable authority to contravene that rule to ensure Wilshire was not unjustly enriched by its wrongful conduct. The unit owners provided no argument in response to Wilshire's assertion that Group 3 owners could not pursue a claim for breach of the implied covenant because there was no conceivable way they could be injured by Webcor's pending mechanics lien claim.

### c. Equitable indemnity

The unit owners also asserted that they were entitled to pursue a claim for equitable indemnity, arguing that "although normally applied to joint tortfeasors, the principle of partial or total equitable indemnity has applied where the liability of the party seeking indemnity has not been based on tort."

### d. Alter ego liability

The unit owners also argued Wilshire had failed to "meet [their] burden to establish that 'one or more elements of alter ego cannot be established as a matter of law." The unit owners argued there were disputed questions of fact as to whether a unity of interest and ownership existed among Wilshire and its member entities and whether an

13

inequitable result would follow if Wilshire's acts were not deemed attributable to those members.

### D. The Trial Court's Ruling

After the hearing on Wilshire's motions for summary judgment, the trial court entered separate judgments in favor of Wilshire against each group of owners. Each judgment incorporated the tentative ruling the court had issued prior to the hearing.

#### 1. Group 1 owners

The trial court ruled the Group 1 owners "lack standing to bring a UCL action" because they had failed to show they lost any "money or property" within the meaning of section 17204. The court explained that "since the unit owners are not entitled to restitution on a lien that has yet to be foreclosed upon, there is no actual 'lost money or property' which would give rise to an actionable UCL claim."

The court further ruled that, even if Group 1 owners had standing to pursue a UCL claim, Wilshire had demonstrated its alleged conduct was neither an "unfair" nor "fraudulent" business practice within the meaning of the UCL. The court began its analysis by summarizing Wilshire's argument: "[Wilshire] asserts distribution was not an unfair business act because (1) it made the distributions pursuant to the . . . Operating Agreement, and (2) the [u]nit [o]wners avoided any potential injury by receiving title insurance from [Wilshire] as required by the [PSA]." The court, however, ruled there was a separate reason why the unit owners' claim failed, explaining that the unit owners had provided "no basis to conclude the distribution by Wilshire" should have been used to pay for construction costs. The court noted that the parties' evidence showed: (1) the project was "primarily funded" through construction loans; and (2) the unit owners had admitted Wilshire had used the purchase funds to pay off the construction loans. The court concluded that "based on this, it cannot be said that [Wilshire] violated § 17200 by paying off its members [with any remaining funds] prior to paying Webcor."

14

The court also ruled Wilshire could not "be held liable under the fraudulent prong of the UCL" because the cross-complaint had failed to allege Wilshire had any duty to disclose it was making distributions to its member entities.

The court ruled Wilshire was entitled to summary adjudication on the Group 1 owners' claim for breach of the implied covenant against encumbrances because the PSA contained "express language" that "specifically reference[d] the possibility that mechanic's liens may be filed." According to the court, this language showed the conveyance had been "'restrained by express terms contained in such conveyance,' such that the implied covenant set forth in Ca. Civil Code, § 1113 is inapplicable."

The court ruled Wilshire was entitled to summary adjudication on all of the unit owners' claims for equitable indemnity because "[e]quitable indemnity . . . was developed to apportion damages among multiple tortfeasors on a comparative negligence basis. . . . As Webcor has not alleged any action in tort against the [u]nit [o]wners or [Wilshire], there is no basis to sue for equitable indemnity."

The court's judgment explained that because it had found Wilshire was entitled to summary adjudication of every claim set forth in the cross-complaint, the Group 1 owners' "'alter-ego' allegations . . . [were rendered] moot."

### 2. Group 2 and 3 unit owners

The trial court ruled the Group 2 owners could not assert a UCL claim against Wilshire because they had admitted they never entered into any transaction with Wilshire and never paid Wilshire any of the purchase funds that it should have allegedly paid to Webcor. The court further concluded that, like the Group 1 owners, the Group 2 owners had no standing to assert a UCL claim because the lien "ha[d] yet to be foreclosed upon."

The court ruled the Group 3 owners also lacked standing to bring a UCL claim, explaining: "[Because] Group 3 [owners] . . . no longer own their units, there is no basis to conclude that they will suffer damage (cloud on title, subject to foreclosure). Moreover, there is no showing that any of these [u]nit [o]wners suffered any injury before selling their respective unit as a result of the mechanic's lien having been filed."

15

On the claim for breach of the implied covenant against encumbrances, the court ruled the Group 2 owners lacked standing because they did not acquire their condominium units from Wilshire. The court explained that "covenants that land is free from encumbrances are personal covenants not running with the land and . . . do not entitle a succeeding grantee to maintain an action in his own name for their breach." The court ruled the Group 3 owners could not maintain a claim for breach of the implied covenant because they no longer owned their units and therefore could not be damaged by Webcor's pending mechanics lien claim.

The trial court's orders stated that Wilshire was entitled to summary adjudication on the remainder of the Group 2 and Group 3 owners' claims for the same reasons set forth in the order pertaining to the Group 1 owners. As with the judgment against the Group 1 owners, the judgments entered against the Group 2 and Group 3 owners stated that the "alter ego" allegations were "moot" in light of the court's "other rulings." The unit owners filed a timely appeal of each judgment.[8]

## DISCUSSION

### A. Standard of Review

"A motion for summary judgment is properly granted only when 'all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' (Code Civ. Proc., § 437c, subd. (c).) We review a grant of summary judgment de novo and decide independently whether the

---

[8] "'Where a defendant cross-complains against a third party or against a codefendant, the dismissal of the cross-complaint is a final adverse adjudication of the cross-complainant's rights against a distinct party, and the order is appealable. [Citations.]' [Citation.]" (*Paragon Real Estate Group of San Francisco, Inc. v. Hansen* (2009) 178 Cal.App.4th 177, 181, fn. 1 [order sustaining demurrer to cross-complaint filed against codefendant appealable]; see also *Yandell v. City of Los Angeles* (1926) 214 Cal. 234, 235-236 [dismissal of a cross-complaint is appealable "where the cross-complaint [i]s filed by . . . defendants against other defendants and the parties in the cross-action were . . . not identical with those in the main action"]; *Jones v. Russ Davis Ford* (1967) 247 Cal.App.2d 725, 727 [dismissal of "cross-complaint . . . [that] names a co-defendant a cross-defendant" constitutes an appealable order].)

16

facts not subject to triable dispute warrant judgment for the moving party as a matter of law.  [Citation]

"When a defendant moves for summary judgment in a situation in which the plaintiff would have the burden of proof at trial by a preponderance of the evidence, the defendant may, but need not, present evidence that conclusively negates an element of the plaintiff's cause of action.  [Citation.]  As an alternative to the difficult task of negating an element, the defendant may present evidence to 'show[ ] that one or more elements of the cause of action . . . cannot be established' by the plaintiff. (§ 437c, subd. (p)(2); [citation].)  A defendant 'has shown that the plaintiff cannot establish at least one element of the cause of action by showing that the plaintiff does not possess, and cannot reasonably obtain, needed evidence:  The defendant must show that the plaintiff *does not possess* needed evidence, because otherwise the plaintiff might be able to establish the elements of the cause of action; the defendant must also show that the plaintiff *cannot reasonably obtain* needed evidence, because the plaintiff must be allowed a reasonable opportunity to oppose the motion. . . .'  [Citations.]  A defendant can satisfy its initial burden to show an absence of evidence through 'admissions by the plaintiff following extensive discovery to the effect that he has discovered nothing' [citation], or through discovery responses that are factually devoid.  [Citations.]

"Only after the defendant's initial burden has been met does the burden shift to the plaintiff to demonstrate, by reference to specific facts not just allegations in the pleadings, there is a triable issue of material fact as to the cause of action.  (§ 437c, subd. (p)(2); [citation].)  On review of an order granting summary judgment, we view the evidence in the light most favorable to the opposing party, liberally construing the opposing party's evidence and strictly scrutinizing the moving party's.  [Citation.]" (*Chavez v. Glock, Inc*. (2012) 207 Cal.App.4th 1283, 1301-1302 [emphases in the original].)  "The same standards apply to motions for summary adjudication." (*Hypertouch, Inc. v. ValueClick, Inc*. (2012) 192 Cal.App.4th 805, 818, fn. 3.)

17

### B. The Trial Court Erred in Granting Summary Adjudication of the Group 1 Owners' UCL Claim

#### 1. Standing under the UCL

The unit owners argue that the trial court erred in concluding that Wilshire demonstrated they lack standing to bring a UCL claim. Business and Professions Code section 17204 limits standing under the UCL to "a person who has suffered injury in fact and has lost money or property as a result of the unfair competition." To satisfy section 17204's standing requirement a "party must . . .[:] (1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., economic injury, and (2) show that that economic injury was the result of, i.e., caused by, the unfair business practice . . . that is the gravamen of the claim." (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 322 (*Kwikset*).)

In this case, the trial court concluded Wilshire had demonstrated the Group 1 and Group 3 owners could not establish economic injury, and that the Group 2 owners could not satisfy either requirement.

#### a. Wilshire did not make a prima facie showing that the Group 1 owners cannot establish economic injury

In the trial court, the Group 1 owners argued they had suffered an economic injury because Webcor's mechanics lien had placed a cloud on their title and caused a diminution in the value of their property. The trial court, however, ruled that because the Group 1 owners had admitted they had not yet paid any funds to Webcor as a result of the lien, they could not satisfy section 17204's lost money or property requirement. The court explained that "[s]ince the [u]nit [o]wners [were] not entitled to restitution on a lien that has yet to be foreclosed upon, there [wa]s no actual 'lost money or property' which would give rise to an actionable UCL claim." In support of its ruling, the court quoted language from a federal district court opinion, *Walker v. USAA Cas. Ins. Co.* (E.D. 2007) 474 F.Supp.2d 1168, stating that the "lost money or property" requirement set forth in section 17204 should "be interpreted in accordance with the construction already given to

18

the 'lost money or property' required to seek restitution under section 17203." (*Id*. at p. 1172.) On appeal, the Group 1 owners contend the trial court erred in interpreting section 17204 as limiting standing to individuals who can demonstrate an entitlement to restitution under section 17203, which describes the remedies available under the UCL. We agree.

To satisfy section 17204's "lost money or property" requirement, a plaintiff need only demonstrate he or she has suffered "some form of economic injury." (*Kwikset, supra,* 51 Cal.4th at pp. 323.) "There are innumerable ways in which economic injury from unfair competition may be shown. A plaintiff may (1) surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have; (2) have a present or future property interest diminished; (3) be deprived of money or property to which he or she has a cognizable claim; or (4) be required to enter into a transaction, costing money or property, that would otherwise have been unnecessary." (*Ibid*.) The economic injury requirement may also be satisfied by showing "a diminishment in the value of some asset a plaintiff possesses." (*Id*. at p. 336.)

In contrast, to establish the right to restitution under section 17203, a plaintiff must do more than merely prove he or she has suffered economic injury as the result of unfair competition. "Restitution under section 17203 is confined to restoration of any interest in 'money or property, real or personal, which may have been *acquired* by means of such unfair competition.' (Italics added.) A restitution order against a defendant thus requires both that money or property have been lost by a plaintiff, on the one hand, and that it have been acquired by a defendant, on the other." (*Kwikset, supra,* 51 Cal.4th at p. 336.)

Our Supreme Court has expressly rejected the argument that section 17204's "lost money or property" requirement confines standing to individuals who have suffered losses that are eligible for restitution. (See *Kwikset*, *supra*, 51 Cal.4th at pp. 335-336.) In *Clayworth v. Pfizer, Inc.* (2010) 49 Cal.4th 758, the Court explained that "this argument conflates the issue of standing with the issue of the remedies to which a party may be entitled. That a party may ultimately be unable to prove a right to damages (or, here, restitution) does not demonstrate that it lacks standing to argue for its entitlement to

19

them." (*Id*. at p. 789.) In *Kwikset, supra*, 51 Cal.4th 310, the Court reaffirmed its holding in *Clayworth*, explaining that "the standards for establishing standing under section 17204 and eligibility for restitution under section 17203 are wholly distinct" and that "ineligibility for restitution is not a basis for denying standing under section 17204." (*Id*. at pp. 335-336, 337.)

In light of *Clayworth* and *Kwikset*, the trial court erred in tying standing under the UCL to the showing required to obtain restitution. As explained in *Kwikset*, section 17204 requires nothing more than that the plaintiff show they suffered an economic injury as a result of unfair competition. In this case, the unit owners have asserted Webcor's mechanics lien has caused a diminution in the value of their property. This qualifies as a form of economic injury sufficient to support standing under section 17204. (See *Kwikset, supra,* 51 Cal.4th at p. 336 ["a diminishment in the value of some asset a plaintiff possesses" constitutes a form of economic injury that satisfies section 17204's "lost money or property" requirement].)

Wilshire, however, argues we should nonetheless affirm the trial court's ruling that the unit owners lack standing because the owners "offered no evidence to the trial court of any change in value of their units." However, as the party moving for summary judgment or summary adjudication, Wilshire had an initial "'burden to show there is no triable issue of fact on [the elements of] UCL standing . . . ' [Citation.]" (*Troyk v. Farmers Group, Inc*. (2009) 171 Cal.App.4th 1305, 1350-1351.) To satisfy this burden, Wilshire had to either introduce evidence demonstrating the unit owners did not suffer any form of economic injury, or, alternatively, by demonstrating the unit owners do not possess, and cannot reasonably obtain evidence of economic injury. Wilshire has cited to no evidence in the record indicating Webcor's mechanics lien did not cause a diminution in the value of the Group 1 owners' property, nor has it made any showing suggesting these owners could not reasonably obtain such evidence. Thus, "it is unnecessary to examine the [unit owners] opposing evidence." (*Diamond v. Superior Court* (2013) 217 Cal.App.4th 1172, 1182.)

20

Wilshire also argues we should affirm the trial court's ruling that the Group 1 owners lack standing under section 17204 because it introduced evidence showing each owner was provided a title insurance policy that will cover any economic injury resulting from Webcor's mechanics lien. The only evidence Wilshire cites in support of this argument consists of: (1) the unit owners' admission that Wilshire provided each of them a title insurance policy as a condition of their purchase; and (2) a provision in the title policy stating that the policy insures against any loss or damage "by reason of [¶] . . . [¶] Any defect in or lien or encumbrance on the title."

Wilshire appears to assert that a plaintiff lacks standing to assert a UCL claim if he or she is insured against the form of economic injury that was allegedly caused by the defendant's unfair competition. Even if we assume Wilshire is correct on this point of law,[9] it has failed to make a prima facie evidentiary showing that the Group 1 owners' insurance policies would actually cover any loss arising from Webcor's mechanics lien claim. Wilshire provided no evidence the Group 1 owners' title insurer has admitted it will provide coverage for any such loss, nor has it provided any evidence the insurer would have no defenses to any claim for coverage predicated on the Webcor lien.[10]

---

[9]    Wilshire has cited no authority suggesting that the availability of insurance is sufficient to defeat standing under section 17204. As a general matter, "[i]nsurance does not eliminate [a] loss, it simply shifts the loss from the landowner to the insurer, which is then entitled to assert its subrogation rights." (*Paterno v. State of California* (2003) 113 Cal.App.4th 998, 1025.) Thus, although the unit owners' title insurance might ultimately entitle them to indemnification for any economic injury they have suffered as a result of the mechanics lien, we fail to see how the availability of insurance negates the existence of the economic injury.

[10]    Wilshire contends the unit owners have made a "judicial admission" that the title insurer will reimburse them "free of charge" for any cost incurred as a result of the mechanics lien. In support, Wilshire cites to a portion of the trial court hearing transcript in which the unit owners' counsel stated: "Well, insurance company is going to pay, on behalf of the unit owners. And again, we come back to where we started, which is, you know, I don't think the law says that [Wilshire's conduct is] okay, because it's the insurance company that's – that's paying on behalf of the unit owners . . ." "Statements of counsel in argument are not deemed judicial admissions unless they have the formality of an admission or a stipulation. [Citations.]" (*People v. Kiney* (2007) 151 Cal.App.4th

21

Instead, it cites to a single policy provision indicating that the policy covers losses sustained by defects in or liens or encumbrances on title. The policy, however, contains numerous other provisions, including several "exclusions from coverage" for, among other things, encumbrances and claims that were "attach[ed] or created subsequent to the Date of Policy" or "not shown by the public records."[11] Wilshire's citation to a single policy provision is simply not sufficient to show that any economic harm the Group 1 owners might suffer from the lien will necessarily qualify as a covered event.

### b. Wilshire established Group 3 owners lack standing to pursue a UCL claim

It is undisputed that the Group 3 owners purchased their unit from Wilshire, but no longer hold title to the units. In the trial court, Wilshire argued the Group 3 owners lacked standing to assert a UCL claim because they could not suffer any possible loss of money or property as the result of Webcor's pending mechanics lien claim. The Group 3 owners' opposition to Wilshire's motion for summary judgment did not provide any

807, 815.) Accordingly, a counsel's statement may not be treated as an admission if "it is made improvidently or unguardedly, . . . is in any way ambiguous . . . [or] lacks the gravity of a complete relinquishment of rights on the issue." (*Irwin v. Pacific Southwest Airlines* (1982) 133 Cal.App.3d 709, 714; see also *Fassberg Const. Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 752.) In this case, counsel's statement was made during a lengthy discussion regarding the relevancy of the unit owners' title insurance policies. This single, isolated comment cannot be fairly construed as a formal, unambiguous and deliberate admission that the title insurer had agreed to cover any losses associated with Webcor's mechanics lien. Moreover, as Wilshire's own attorney clarified at the trial court hearing, the title insurer is a "distinct entit[y]" from the unit owners, it is not "a party to this action" and its "rights" are not at issue in this litigation. We therefore fail to see how a statement by the unit owners' counsel can be treated as an admission binding the title insurer to coverage under its policy.

[11] It is undisputed that the unit owners' title insurance policies were issued before Webcor recorded its mechanics lien. Wilshire's appellate brief asserts that a mechanics lien does not constitute an encumbrance on property until it has been recorded. Thus, Wilshire's own arguments suggest the title insurer might have grounds to assert its title policy does not apply to Webcor's lien.

response to this argument. The trial court agreed with Wilshire, explaining "'Group 3 Unit Owners . . . lack[] standing as they no longer own the real property at issue and, thus, are no longer susceptible to any future harm as a consequence of this action – there is nothing left to restore or enjoin.'"

For the first time on appeal, Group 3 owners contend they suffered economic injury as the result of Wilshire's conduct because they "acquired less than they otherwise would have." They offer no further explanation regarding the nature of their alleged "economic injury." As the appellants, the Group 3 owners had a duty to "affirmatively demonstrate [the trial court committed] error." (*People v. White Eagle* (1996) 48 Cal.App.4th 1511, 1523.) "This burden requires more than a mere assertion that the judgment is wrong. . . . It is not our place to construct theories or arguments to undermine the judgment and defeat the presumption of correctness. When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852; see also *Cahill, supra,* 194 Cal.App.4th at p. 956 ["'The absence of cogent legal argument or citation to authority allows this court to treat the contention as waived'"].) The Group 3 owners' conclusory assertion that they "acquired less than they would have" is not sufficient to demonstrate the trial court erred in its ruling.

Moreover, as the trial court explained, it is apparent the Group 3 owners cannot suffer any of the forms of economic injury for which they have sought redress. The cross-complaint and Group 3 owners' trial briefs allege they have been harmed by Webcor's mechanics lien claim because: the lien constitutes a cloud on their title; their units are now subject to potential foreclosure; and the value of their property has been diminished. However, because the Group 3 owners no longer own their units, they cannot possibly suffer any of these forms of injury. We therefore affirm the grant of summary adjudication on the Group 3 owners' UCL claim for lack of standing.

23

Wilshire's motion for summary judgment argued that the Group 2 owners lacked standing to assert a UCL claim based on their admission that they "did not buy their units from or pay any money to [Wilshire or its member entities]." The trial court agreed, ruling that the Group 2 unit owners' admission they did not pay Wilshire any money demonstrated that their purported harm–being subject to the mechanics lien claim – was not caused by the conduct alleged in the cross-complaint–Wilshire's decision to distribute purchase funds received from the unit owners to its member entities. The court further concluded the Group 2 owners lacked standing for the same reasons as the Group 1 owners: they had not demonstrated the loss of money or property because the lien had yet to be foreclosed on.

On appeal, the Group 2 owners contend they have alleged the same forms of economic harm resulting from the mechanics lien as the Group 1 owners; namely, cloud on their title and a diminution in the value of their property. Although the trial court's order regarding the Group 2 owners applied the same erroneous interpretation of section 17204's "lost money and property requirement" discussed above , the Group 2 owners have failed to address the other basis for the court's ruling: lack of causation.

To establish standing to assert a UCL claim, the plaintiff must show not only economic injury, but also that the economic injury "was the result of, i.e., caused by, the unfair business practice . . . that is the gravamen of the claim." (*Kwikset, supra,* 51 Cal.4th at p. 322.) In this case, the UCL claim set forth in the cross-complaint alleges Wilshire "received various purchase money funds from [the unit owners] which was intended . . . for the purpose of paying . . . to complete the construction of the Project." It further alleges that Wilshire "began diverting the funds received for the completion of the Project to its [alter ego] members, all of whom knew of [Wilshire's] still outstanding payment obligation to [Webcor] for completion of the project." According to the cross-complaint, Wilshire's "diversion of funds and failure to complete improvement for which it had received funds from [the unit owners] was knowing, willful and deliberate" and an

24

"'unfair' . . . . practice as [that] term is defined in [section] 17200." The cross-complaint complaint further alleges that, as a result of this unfair conduct, the unit owners "have been . . . damaged by, among other things, having their property potentially subject to foreclosure on Webcor's mechanics lien claim [and] being subject to Webcor's $17.5 million claim for unpaid labor and materials as a result of [Wilshire's] failure to fulfill its contract with [Webcor]."

The cross-complaint makes clear that the gravamen of the unit owners' UCL claim is that Wilshire took their purchase funds, which were supposed to be used to complete the project (which included paying its contractor Webcor), and distributed the money to its alter ego members. As the trial court pointed out, the Group 2 owners were not subjected to this alleged unfair business practice because they did not give Wilshire any money or property that was supposed to be used to complete the project; indeed, they did not engage in any business transaction with Wilshire whatsoever. (See generally *Kwikset, supra*, 51 Cal.4th at p. 317 ["apparent purpose" of section 17204's standing requirement is "to eliminate standing for those who have not engaged in any business dealings with would-be defendants"].) Because the Group 2 unit owners were not subjected to the unfair practice alleged in the cross-complaint, their alleged harm could not have been "caused" by that practice. Accordingly, the trial court did not err in concluding the Group 2 owners lack standing to pursue the UCL claim.

> 2. *Wilshire failed to make a prima facie showing that it did not commit an unfair business practice*

The trial court ruled that, even if the unit owners had standing to pursue a section 17200 claim, Wilshire had provided evidence demonstrating that the conduct alleged in the cross-complaint did not qualify as an "unfair" business practice within the meaning of the UCL.

"In consumer cases arising under the UCL, a business practice is 'unfair' if: (1) the consumer injury is substantial; (2) the injury is not outweighed by any countervailing benefits to consumers or competition; and (3) the injury could not reasonably have been

avoided by consumers themselves. [Citations.] 'Whether a practice is . . . unfair is generally a question of fact which requires "consideration and weighing of evidence from both sides" . . .' [Citation.]" (*Klein v. Chevron U.S.A., Inc.* (2012) 202 Cal.App.4th 1342, 1376 (*Klein*) [citing and quoting *Camacho v. Automobile Club of Southern California* (2006) 142 Cal.App.4th 1394, 1403 (*Camacho*).)**12**

The trial court's order explained that the unit owners' UCL claim failed because there was "no basis to conclude" Wilshire should have used their purchase funds to pay for the construction and completion of the project. The court noted the parties' evidence showed Wilshire had obtained construction loans to finance the project and then used the unit owners' purchase funds to pay off those loans. In support, the court cited to an undisputed fact in the unit owners' separate statement asserting that "'[t]he [u]nit [o]wners' purchase money funds were used to pay off the . . . construction loans.'" The court explained that, "[b]ased on this, it cannot be said that [Wilshire] violated § 17200 by paying off its members prior to paying Webcor."

It appears the court misperceived the nature of the unit owners' unfair competition claim. The unit owners' claim does not involve the portion of the purchase funds Wilshire used to pay off its construction loans. Rather, the unit owners allege that, after paying off those construction loans, Wilshire possessed $25 million in remaining purchase funds. The unit owners further allege that although Wilshire knew it still owed Webcor a substantial amount of money for construction costs, it chose to distribute the

---

**12**     There is currently a split of authority with respect to the proper definition of the term "unfair" in the context of consumer cases arising under the UCL. (See generally *Davis v. Ford Motor Credit Co.* (2009) 179 Cal.App.4th 581, 584, 594-597 (*Davis*); *Drum v. San Fernando Valley Bar Assn.* (2010) 182 Cal.App.4th 247, 256 ["Courts of Appeal ... have applied three different tests for unfairness in consumer cases"].) However, this District has consistently followed the definition enunciated in *Camacho, supra,* 142 Cal.App.4th at p. 1403, which was decided by Division Three of this District in 2006. (See *Klein, supra,* 202 Cal.App.4th at p. 1376, fn. 11 [adopting *Camacho*'s definition of "unfair" in consumer cases]; *Davis, supra,* 179 Cal.App.4th at p. 596 [*Camacho* "contains an excellent analysis of the issue and we adopt its definition of 'unfair' in consumer cases"]; *Daugherty v. American Honda Motor Co., Inc.* (2006) 144 Cal.App.4th 824, 838-839 [applying and following *Camacho*].)

remaining purchase funds to its member entities as "profits." The court's analysis does not address whether Wilshire's decision to distribute the remaining $25 million to its member entities, rather than using it to pay the debt it owed to Webcor, could be construed as an unfair business practice.

Wilshire, however, argues that we may affirm the trial court's ruling based on other arguments that were raised in its motion for summary judgment, but were not addressed in the court's ruling. (*Securitas Security Services USA, Inc. v. Superior Court* (2011) 197 Cal.App.4th 115, 120 ["We will affirm a summary judgment or summary adjudication if it is correct on any ground that the parties had an adequate opportunity to address in the trial court, regardless of the trial court's stated reasons].) First, Wilshire argues its conduct was not unfair because it was contractually obligated to distribute the remaining purchase funds to its member entities. Specifically, Wilshire contends the "Operating Agreement" entered into between Wilshire's member entities contained "binding contractual obligations" that required it to distribute the remaining purchase funds at the time and in the manner it did.[13] This argument fails for two reasons.

First, Wilshire has failed to make a prima facie showing that the terms of the Operating Agreement required it to distribute the remaining purchase funds to its member entities. The only evidence Wilshire cites in support of this assertion consists of: (1) deposition testimony in which the managing partner of Wilshire stated the Operating Agreement required the disbursement of "distributable proceeds" on a quarterly basis; and (2) letters from CLD (a Wilshire member entity) asserting Wilshire was required to distribute the funds under the terms of the Operating Agreement. Neither piece of evidence shows the Operating Agreement required Wilshire to distribute the remaining

---

[13]    Wilshire characterizes its assertion that the terms of the Operating Agreement required it to distribute the remaining funds to its members as an "undisputed" fact. However, it has cited no evidence showing the unit owners have ever made any such concession. In the trial court, the unit owners' filed a response to Wilshire's separate statement of undisputed facts that specifically disputed whether "such Operating Agreement . . . 'mandates' [the] distributions." The unit owners' response also asserted Wilshire "failed to follow the provisions of the Operating Agreement" by making "distributions to its members" prior to "paying the claims" of its creditors.

portion of the unit owners' purchase funds to its member entities. The cited deposition testimony merely states that Wilshire had to distribute "distributable proceeds" on a quarterly basis; the testimony does not define the meaning of that term, nor does it explain why the remaining purchase funds qualified as "distributable proceeds." The letters from CLD, on the other hand, simply constitute a demand for payment; they do not demonstrate the payments were in fact contractually obligated.

Second, even if Wilshire had made an evidentiary showing the Operating Agreement required it to distribute the remaining purchase funds, the unit owners have alleged that every signatory to that agreement was an alter ego entity of Wilshire. The unit owners essentially contend Wilshire was distributing the purchase funds to itself through an operating agreement that it entered into with itself. Accordingly, without a determination as to the unit owners' alter ego allegations (which the trial court declined to make), it is impossible to evaluate what relevance, if any, the terms of the Operating Agreement have on assessing the "unfairness" of Wilshire's conduct.

Wilshire also argues we should affirm the trial court's dismissal of the unfairness claim because the unit owners "avoided any potential injury arising from [the mechanics lien claim] by receiving title insurance." According to Wilshire, the undisputed evidence shows the unit owners will "never pay Webcor any money because of title insurance, purchased by [Wilshire], insuring [unit owners] against any future loss caused by Webcor's mechanic's lien." In support, Wilshire cites to a single provision in the unit owners' title policy stating that the policy insures against any loss or damage "by reason of [¶] . . .[¶] Any defect in or lien or encumbrance on the title."

This is essentially the same argument (supported by the same evidence) that Wilshire raised in relation to the Group 1 owners' standing to assert a UCL claim; it fails for the same reasons. Even if we assume the availability of insurance coverage might provide a proper basis for dismissing a UCL "unfairness" claim, Wilshire's reference to a single provision in the title insurance policy is insufficient to show the insurer will cover

28

any loss arising from the mechanics lien claim or that the insurer would lack any defenses to coverage.**14**

In sum, Wilshire failed to make a prima facie showing that the unit owners could not demonstrate the conduct alleged in their cross-complaint was an unfair business practice within the meaning of the UCL. We therefore reverse the trial court's grant of summary adjudication on the Group 1 owners' UCL claim.**15** The court's dismissal of the Group 2 and Group 3 owners' UCL claim, however, is affirmed .

### C. *Wilshire is Entitled to Summary Adjudication on the Unit Owners' Claim for Breach of the Implied Covenant Against Encumbrances*

Civil Code section 1113 "'implies a covenant against encumbrances in a grant deed "unless restrained by express terms contained in such conveyance."'" [Citation.]" (*Thorstrom v. Thorstrom* (2011) 196 Cal.App.4th 1406, 1416.)**16** The unit owners allege Wilshire violated section 1113's implied covenant by conveying condominium units that

---

**14** For the first time on appeal, Wilshire also argues the unit owners' unfairness claim fails as a matter of law because they could have reasonably avoided their injury by investigating whether a mechanics lien could be recorded against their property. We decline to address this new argument, which was never presented to the trial court. (*C9 Ventures v. SVC-West, L.P.* (2012) 202 Cal.App.4th 1483, 1491 ["An appellate court ordinarily will not consider arguments made for the first time on appeal"].)

**15** Because we reverse the trial court's summary adjudication of the Group 1 owners' UCL claim on the basis of the "unfairness" prong, we need not address the owners' arguments regarding the "fraudulent" prong.

**16** Civil Code section 1113 reads: "From the use of the word 'grant' in any conveyance by which an estate of inheritance or fee simple is to be passed, the following covenants, and none other, on the part of the grantor for himself and his heirs to the grantee, his heirs, and assigns, are implied, unless restrained by express terms contained in such conveyance: [¶] 1. That previous to the time of the execution of such conveyance, the grantor has not conveyed the same estate, or any right, title, or interest therein, to any person other than the grantee; [¶] 2. That such estate is at the time of the execution of such conveyance free from encumbrances done, made, or suffered by the grantor, or any person claiming under him. [¶] Such covenants may be sued upon in the same manner as if they had been expressly inserted in the conveyance."

29

were encumbered by Webcor's "inchoate [mechanics] lien rights." The trial court ruled that Wilshire was entitled to summary adjudication of this claim against all three owner groups.

### 1. Group 2 owners cannot pursue a claim for breach of the implied covenant because they did not take title from Wilshire

The trial court ruled that Group 2 owners could not assert a claim for breach of the implied covenant against Wilshire because they did not purchase their units from Wilshire, nor did they take title from Wilshire. The court's ruling is supported by well-established case law.

Our Supreme Court has repeatedly held that the implied covenant set forth in Civil Code section 1113 constitutes a "personal covenant . . . [that] does not run with the land or pass to the assignee." (*McPike v. Heaton* (1900) 131 Cal. 109, 111 (*McPike*); see also *Woodward v. Brown* (1897) 119 Cal. 283, 294 [covenant set forth in section 1113 is "a personal covenant" that "does not run with the land"].) In *McPike*, the Court ruled that the plaintiffs could not assert a claim for breach of the implied covenant against an individual who did not grant them their property and with whom they had "no contractual relation." (*McPike, supra*, 131 Cal. at p. 111; see also *Babb v. Weemer* (1964) 225 Cal.App.2d 546, 551 (*Babb*) [it is now "well-settled . . . that the covenants [set forth in section 11113] are personal covenants not running with the land and that they do not entitle a succeeding grantee to maintain an action in his own name for their breach"].)

### 2. Group 3 owners failed to state a claim for breach of the implied covenant because they have identified no harm they may suffer as the result of Webcor's pending mechanics lien claim

The trial court ruled the Group 3 owners, who no longer hold title to their condominium units, may not maintain a claim for breach of the implied covenant against Wilshire because they failed to allege any harm or loss they might suffer as a result of Webcor's pending mechanics lien claim.

The unit owners' cross-complaint alleges that, "as a proximate result of [Wilshire's] breach of the implied covenants [set forth in section 1113]," they have been

damaged by "having their property potentially subject to foreclosure on [Webcor's] mechanic's lien [and] being subject to Webcor's $17.5 million claim for unpaid labor and materials as a result of [Wilshire's] failure to full its contract with Webcor . . ." In their opposition to Wilshire's motions for summary judgment, the Group 3 owners, who have already sold their units, failed to explain how they might suffer either form of injury.

On appeal, the Group 3 owners have again failed to identify any harm they have suffered, or might suffer, as a result of Webcor's pending mechanics lien claim. The only argument they present on this issue consists of a single sentence stating that Group 3 owners "received Grant Deeds from [Wilshire] in which the implied covenants were breached to their detriment." Their brief does not describe the nature of this purported "detriment" nor does it cite to any part of the record that describes the detriment. Because the Group 3 owners have provided no "reasoned argument" explaining why the trial court erred in concluding they suffered no harm as a result of Wilshire's alleged breach of the implied covenant, they have forfeited any claim of error. (See *Cahill, supra,* 194 Cal.App.4th at p. 956 ["""When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived"""].)

### 3. Wilshire is entitled to summary adjudication of the Group 1 owners' claim for breach of the implied covenant

The trial court ruled that the Group 1 owners could not prevail on their claim for breach of the implied covenant because language in their purchase sale agreement (PSA) with Wilshire expressly "warned of mechanic's liens and, additionally, provided for [title] insurance." The court explained that because the PSA "specifically reference[d] the possibility that mechanics liens may be filed [against the property] . . . the conveyance [wa]s 'restrained by express terms contained in such conveyance,' such that the implied covenant set forth in [Civil Code section] 1113 is inapplicable."

The Group 1 owners argue the court committed two errors in ruling on their claim for breach of implied covenant against encumbrances. First, they assert the court erred in

31

relying on the PSA, rather than on the deed itself, in determining the terms of the conveyance. Second, they assert that, even if the court properly considered the PSA, the agreement did not contain an express provision clarifying that their title was subject to unrecorded mechanics liens claims.

### *a. Summary of relevant terms in the PSA*

Each Group 1 owner entered into a PSA with Wilshire stating that, once executed by both parties, the document would "constitute a binding agreement between Buyer and Seller for the purchase and sale of the hereinafter described real property and shall also constitute instructions to [the escrow holder]." The agreement further stated that "For the consideration herein stated, Buyer agrees to purchase and Seller agrees to sell Condominium Unit [ ] as shown on the Condominium Plan . . . and other real property as described in the grant deed ("Grant Deed") attached here to as Exhibit "A" and incorporated herein by this reference . . ."

The PSA included a section entitled "Title" that stated, in relevant part: "Buyer agrees to pay in to Escrow the balance of the Purchase Price prior to the date scheduled for the Close of Escrow. Seller will hand Escrow Holder a Grant Deed conveying title to the Property to Buyer, and Buyer and Seller will timely deliver to Escrow Holder all additional funds and documents required of them . . . to enable Escrow Holder to comply with these joint escrow instructions and to consummate this transaction. Escrow Holder is authorized to use and/or deliver all such delivered items when all provisions and conditions of this escrow have been complied with and Escrow Holder holds in this Escrow the money and documents called for under these instructions and can obtain a title company's standard CTLA Owners Policy of title insurance with a liability limit equal to the Purchase Price . . . , subject only to . . . : [listing several exceptions to which the title would be subject]." The exceptions to which the title would be subject included, in part: the covenants, conditions and restrictions that were to be recorded in connection with the project; any easements and other matters reserved to the seller in the attached

and incorporated grant deed; and non-delinquent real and personal property taxes and assessments.

The PSA contained a separate section entitled "Close of Escrow." The section stated, in relevant part: "This escrow shall not close, funds shall not be released and title shall not be conveyed to Buyer until each of the following conditions has been met:

(a) Any and all blanket encumbrances, as defined in California Business and Professions Code section 11013, affecting the Property have been released and the statutory period for recordation of all mechanic's lien claims has expired, or the Title Policy shall include an endorsement insuring Buyer and the Association against unrecorded mechanic's liens; and [¶] . . . [¶]

(c) All common facilities and improvement in the Project have been completed, as evidence by a Notice of Completion (as defined in Civil Code Section 3093) being recorded covering all the foregoing improvements; and either (i) the statutory period for recordation of all mechanic's liens has expired, or (ii) the Buyer and the Association are provided with policies of title insurance with endorsements against mechanic's liens; **OR** [¶] Buyer's funds may be released from Escrow after conveyance of title to him, upon completion of all such common facilities and improvement, but prior to expiration of the statutory period of mechanic's lien claims pertinent to said Project if Seller has provided that each such purchaser of a Unit shall receive a policy of title insurance with provision guaranteeing the purchaser against any mechanic's liens affecting the purchaser's property that may raise during the applicable statutory mechanic's lien period . . ."

### b. The trial court did not err in considering the terms of the PSA

The Group 1 unit owners first argue the trial court erred by considering the terms of the PSA when determining whether Wilshire had conveyed title to the property subject to unrecorded mechanics lien claims.[17] The unit owners contend that, under the plain

---

**17** For the purposes of appeal, we will assume the "the inchoate right to assert [a] mechanics lien" constitutes an encumbrance on property within the meaning of Civil Code section 1113.

33

language of Civil Code section 1113, the implied covenant against encumbrances may be restrained only by express terms that "appear in [the] conveyance [instrument] – i.e., the Grant Deed themselves."

In *Campbell v. Miller* (1928) 205 Cal. 22 (*Campbell*), the California Supreme Court considered and rejected a similar argument. In *Campbell*, the buyer agreed to purchase real property that was then subject to a lease which was to continue two years beyond the date of purchase. Although the grant deed made no reference to the lease, the parties had previously entered into escrow instructions in which the buyer had expressly agreed to "waive [the] securing lease through escrow." (*Id*. at p. 22.) After taking possession of the property, the buyer filed a complaint alleging the seller had breached the implied covenant against encumbrances because the grant deed did not reference the lease. The trial court entered judgment against the buyer, ruling he had taken title to the premises subject to the terms of the lease.

The Supreme Court affirmed, explaining that the "the transfer of the property from [seller] to [buyer] was consummated through [an] escrow [agreement]" that contained "an express waiver" regarding the lease. (*Campbell, supra,* 205 Cal. at p. 23.) Although the Court noted there was considerable evidence the buyer had prior knowledge of the lease, it "refer[red] particularly to the written escrow instructions, which were signed by the parties and under which the grant deed to [buyer] was prepared and executed . . . and contain[ed] an express waiver [regarding the lease]." (*Id*. at p. 24.)

The Court rejected the buyer's argument "that he was entitled to rest upon his grant deed and the implied covenant therein against encumbrances suffered by the grantor," explaining: "Ordinarily this would be so, but in the present instance, by an agreement in writing under which the deed was drawn and thereafter executed and delivered, he expressly waived this implied covenant and agreed to accept the title to the property subject to the lease." (*Campbell, supra,* 205 Cal. at p. 25; see also 54 Cal. Jur. 3d Real Estate § 249 ["a purchaser may waive the implied covenant against encumbrances . . . . in a separate, written instrument such as escrow instructions"]; cf. *Katemis v. Westerlind* (1953) 120 Cal.App.2d 537, 542 ["where the terms of an executory

agreement for the sale of real property are clarified and elucidated by the provisions contained in escrow instructions, both instruments are to be considered together in arriving at the total understanding of the contracting parties and in fixing their correlative rights and obligations"].)

As in *Campbell*, the grant deeds Wilshire delivered to the unit owners were drawn, executed and delivered under the terms set forth in the PSA. Indeed, the PSAs specifically included a copy of the grant deeds that would be delivered and recorded at the close of escrow, and incorporated the deed into the agreement.  Under *Campbell*, the trial court did not err in considering the terms of the PSA in assessing the validity of the unit owners' implied covenant claim.

The unit owners disagree, asserting that "*Campbell* does not support [Wilshire's]" argument that "the implied covenants of title can be waived by a separate document." According to the unit owners, *Campbell* is inapplicable "because it implicated a clear, express waiver in the escrow instructions [¶] . . . [¶] In contrast here, neither the PSA nor the Grand Deeds included a waiver, let alone one as clear and express as that in *Campbell*."  This argument, however, fails to explain why *Campbell* does not support Wilshire's argument that the implied covenant can be waived in a separate document, such as escrow instructions.  Regardless of whether the PSA included a "clear and express" waiver regarding unrecorded mechanics liens (an issue we examine below), under the holding in *Campbell*, the court was permitted to consider the agreement in determining the terms of the parties' conveyance.[18]

---

**18**     The unit owners also assert *Campbell* is inapplicable here because "of the long time gap between the PSAs and the Grant deeds which were executed a year or more later."  The unit owners have cited no authority suggesting that the amount of time that passes between the execution of a sales agreement under which a deed is drawn and the actual recording of the deed has any relevance in determining whether a court may consider the sales agreement in construing the intended terms of the parties' conveyance.

35

*c. The PSA contains express provisions demonstrating that title was taken subject to unrecorded mechanics liens*

The Group 1 owners also argue the court erred in concluding the terms of the PSA restrained Wilshire's implied covenant that it would provide title free of any unrecorded mechanics lien claims.

"There can be no implied covenant [under section 1113] where the subject matter is expressly agreed upon by the parties to the contrary." (*Babb, supra*, 225 Cal.App.2d at p. 552.) In this case, the PSA expressly stated that "title shall not be conveyed to Buyer until" either "the statutory period for recordation of all mechanic's lien claims has expired, or the Title Policy shall include an endorsement insuring Buyer . . . against unrecorded mechanic's liens." The PSA includes a similar provision regarding the common areas of the condominium project, stating that "title shall not be conveyed to the Buyer" until "All common facilities and improvement in the Project have been completed, as evidence by a Notice of Completion . . . being recorded covering all the foregoing improvements; and either (i) the statutory period for recordation of all mechanic's liens has expired, or (ii) the Buyer and the Association are provided with policies of title insurance with endorsements against mechanic's liens."

Thus, each unit owner was expressly informed that title would not be conveyed until either the statutory period for recording a mechanics lien had expired, or Wilshire provided a title insurance policy protecting against mechanics liens. It is difficult to understand what the parties could have meant by this language other than to clarify that if title was conveyed prior to the expiration of the mechanics lien period, unit owners would be protected against the possibility of a currently unrecorded mechanics lien claim through the provision of title insurance.

The unit owners, however, contend the above provisions did not adequately notify them of the possibility of unrecorded mechanics lien claims because the provisions did not appear in the section of the PSA pertaining to "Title," but rather appeared in a section entitled "Close of Escrow." The unit owners argue that that the "Title" section included seven express exceptions to which title would be subject and did not list unrecorded

36

mechanics liens. The unit owners further contend the "Close of Escrow" portion of the agreement merely informed the escrow holder when it was permitted to deliver the grant deed.

This argument cannot prevail. Regardless of where in the PSA the provisions regarding mechanics liens appeared, they clearly state that "title shall not be conveyed" unless the time to file a mechanics lien had expired, or title insurance was provided that included coverage for mechanics liens. Thus, the unit owners were expressly informed that, in the event they received title insurance including an endorsement against mechanics liens, the title they received might be subject to a future mechanics lien claim.

### D. The Unit Owners Have Failed to State a Claim for Equitable Indemnity

The unit owners argue that the trial court erred in granting summary adjudication on their claim for equitable indemnity, which alleges that: "[If found] liable to [Webcor] . . . . [the unit owners] are entitled to be indemnified . . . under the principles of equitable indemnity by [Wilshire,] . . . either from all the damages or from a percentage based upon principles of comparative fault. . . ." The trial court ruled that because Webcor had not filed any tort claim against the unit owners or Wilshire, the unit owners had "no basis to sue for equitable indemnity."

On appeal, the unit owners admit their claim for equitable indemnity is "based entirely on Wilshire's contract with Webcor." They argue, however, that equitable indemnity is not limited to claims predicated on tort liability, and "includes within its purview the concept of implied contractual indemnity." Based on these statements, the unit owners appear to be arguing that the doctrine of equitable indemnity may be applied where the basis for liability against the indemnitor is predicated on the indemnitor's breach of a contract with a third party.

Equitable indemnity has two forms: (1) "traditional equitable indemnity," which "'is premised on a joint legal obligation to another for damages'"; and (2) "implied contractual indemnity," which is "indemnity implied from a contract not specifically mentioning indemnity." (*Prince v. Pacific Gas & Electric Co.* (2009) 45 Cal.4th 1151,

1157-1158 [explaining that "implied contractual indemnity is now viewed simply as "a form of equitable indemnity"]; see also *Jocer Enterprises, Inc. v. Price* (2010) 183 Cal.App.4th 559, 573 ["equitable indemnity . . . embraces 'traditional equitable indemnity' and implied contractual indemnity"].) The unit owners have failed to state a claim for either form of equitable indemnity.

Traditional equitable indemnity "permit[s] a concurrent tortfeasor to obtain partial indemnity from other concurrent tortfeasors on a comparative fault basis." (*American Motorcycle Assn. v. Superior Court* (1975) 20 Cal.3d 578, 598.) "The doctrine applies only among defendants who are jointly and severally liable to the plaintiff. [Citation.] . . . [Although] joint and several liability in the context of [traditional] equitable indemnity is fairly expansive[,] . . . . [¶] [o]ne factor is necessary[:] . . . With limited exception, there must be some basis for tort liability against the proposed indemnitor. . . . " (*BFGC Architects Planners, Inc. v. Forcum/Mackey Construction* (2004) 119 Cal.App.4th 848, 852.) Thus, a claim for traditional equitable indemnity will not lie where the "allegations of defendants' misconduct are based on their alleged breach of contract." (*Id.* at p. 853.) As stated above, in this case, the unit owners admit their indemnification claim is predicated on liability arising from Wilshire's alleged breach of its contract with Webcor.

The right to implied contractual indemnity is "predicated on the indemnitor's breach of contract with the indemnitee." (*Garlock Sealing Technologies, LLC v. NAK Sealing Technologies Corp.* (2007) 148 Cal.App.4th 937, 968 (*Garlock*).) In contrast to traditional equitable indemnity, "'[a]n action for implied contractual indemnity is not a claim for contribution from a joint tortfeasor; it is not founded upon a tort or upon any duty which the indemnitor owes to the injured third party. It is grounded upon the indemnitor's breach of duty owing to the indemnitee to properly perform its contractual duties.' [Citation.]" (*West v. Superior Court* (1994) 27 Cal.App.4th 1625, 1633.)

The unit owners' cross-complaint does not include a claim for implied contractual indemnity, nor does it include any reference to the doctrine of implied contractual indemnity. They never referred to the doctrine in their opposition to Wilshire's motion

38

for summary judgment and they did not mention it at the motion hearing. "'"[I]t is fundamental that a reviewing court will ordinarily not consider claims made for the first time on appeal which could have been but were not presented to the trial court." . . . "Generally, issues raised for the first time on appeal which were not litigated in the trial court are waived. [Citations.]'" [Citation.]" (*Bank of America, N.A. v. Roberts* (2013) 217 Cal.App.4th 1386, 1399.) Because the unit owners did not raise a claim for implied contractual indemnity in the trial court, they have forfeited their right to assert the claim on appeal.

Even if the unit owners had not forfeited the claim, they have not identified any conduct on behalf of Wilshire that would support a claim for implied contractual indemnity. As explained above, implied contractual indemnity is "predicated on the indemnitor's breach of contract with the indemnitee." (*Garlock, supra,* 148 Cal.App.4th at p. 968.) The unit owners have not identified any breach of contract that Wilshire committed against them. Instead, their indemnity claim asserts that "if [they are found to be] liable to Webcor, then [Wilshire] should account for that liability because it is based entirely on Wilshire's contract with Webcor." Wilshire's alleged breach of a contract with a third party does not support a claim for implied contractual indemnity.[19]

_____

[19] The theory of recovery set forth by the unit owners, which effectively seeks repayment of a debt for which Wilshire was allegedly responsible, appears to sound in equitable subrogation. (See *Caito v. United California Bank* (1978) 20 Cal.3d 694, 704 ["'[T]he doctrine of equitable subrogation . . . is broad enough to include every instance in which one person, not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter'"]; see also *Roylance v. Doelger* (1962) 57 Cal.2d 255, 257-258, 262 [insurer permitted to file cross-complaint for declaratory relief seeking a determination it would have subrogation rights against third parties in the event it was found liable on original complaint].) The unit owners did allege a claim for equitable subrogation in their cross-complaint, which the trial court dismissed on summary adjudication. The unit owners, however, have not addressed their subrogation claim in their appeal briefs. Accordingly, the claim has been abandoned. (See *Ante*, fn. 5; *Wall Street, supra*, 164 Cal.App.4th at p. 1177 ["Generally, appellants forfeit or abandon contentions of error regarding the dismissal of a cause of action by failing to raise or

## DISPOSITION

The judgments in favor of the Cross-Defendants against the Group 2 unit owners and the Group 3 unit owners are affirmed. The judgment in favor of Cross-Defendants against the Group 1 owners is reversed and the matter remanded for further proceedings consistent with this opinion.  The parties shall bear their own costs on appeal.


ZELON, J.

We concur:


PERLUSS, P. J.


SEGAL, J.*

---

address the contentions in their briefs on appeal.  [Citations.]  Thus, failure to address summary adjudication of a claim on appeal constitutes abandonment of that claim"].)

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.